**GENERAL ELECTRIC COMPANY,**
Petitioner, Cross–Respondent,

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**
Cross–Petitioner.

Local 571, Sheet Metal Workers International Association,
Intervenor.

Nos. 89–2362, 89–2538.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 24, 1990.

Decided Oct. 18, 1990.

Carol L. VanHal, Paul F. Gleeson, John E. Old, Christopher A. Johlie, Vedder, Price, Kaufman & Kammholz, Chicago, Ill., Earl J. Jones, Jr., General Elec. Co., Louisville, Ky., for General Elec. Credit Corp.

Aileen A. Armstrong, Scott MacDonald, Appellate Court—Enforcement Litigation, Fred L. Cornnell, Jr., Charles P. Donnelly, Jr., N.L.R.B., Washington, D.C., Irving M. King, Cotton, Watt, Jones & King, Donald J. Crawford, Harvey A. Roth, N.L.R.B., Chicago, Ill., for N.L.R.B.

Paul F. Gleeson, John E. Old, Carol L. VanHal, Christopher A. Johlie, Vedder, Price, Kaufman & Kammholz, Chicago, Ill., Earl J. Jones, Jr., Mark E. Brennan, General Elec. Co., Louisville, Ky., Stanley R. Strauss, Vedder, Price, Kaufman, Kammholz & Day, Washington, D.C., for General Elec. Co.

Irving M. King, Cotton, Watt, Jones & King, Chicago, Ill., for Local 571, Sheet Metal Workers Intern. Assn, AFL–CIO.

Before BAUER, Chief Judge, and RIPPLE and KANNE, Circuit Judges.

BAUER, Chief Judge.

The General Electric Company ("G.E.") petitions this court for review of a decision and order of the National Labor Relations Board ("N.L.R.B." or "Board"), reported at 294 NLRB No. 11 (May 23, 1989) (*"Board Decision"*). In that decision, the Board affirmed and adopted (with one modification discussed below) the decision of the Administrative Law Judge ("ALJ"), who held that G.E. violated sections 8(a)(1) and 8(a)(5) of the National Labor Relations Act ("Act"), 29 U.S.C. § 158(a)(1) & (5), by refusing to provide information requested by Local 571, Sheet Metal Workers International Association, AFL–CIO ("Union"). The Board, in response, cross-petitions for enforcement of its order, and the Union intervenes in support of the Board's order. At issue is the Board's ruling that G.E.'s duty to bargain in good faith required G.E.

to turn over requested cost information on certain maintenance subcontracts or be guilty of an unfair labor practice. Because that ruling is not supported by substantial evidence in the record as a whole and evidences an unreasonable application of the Act, we decline to enforce the Board's order.

I

G.E. operates an appliance manufacturing facility in Cicero, Illinois. The Union represents a unit of production and maintenance employees at G.E.'s Cicero facility. The two have been parties to collective-bargaining agreements ("CBAs") since 1963. In all of these CBAs, including the 1985–88 CBA that was effective at the time of the actions involved here, G.E. management retained the right to subcontract. As stated in the "Management Rights" provision of the 1985–88 CBA:

> The Union recognizes that the Company maintains the exclusive right to manage its business in such manner as the Company shall determine, subject only to those provisions of this Agreement which expressly qualify this right. The Company's right to manage its business affairs shall include, but not be limited to, its rights to determine the methods and means by which its operations are to be carried on, *to subcontract,* to discontinue or relocate all or any portion of such operations, to assign work, to schedule hours of work including overtime, and to establish the size, composition and qualifications of the work force, to determine job classifications, standards and rates of pay and to maintain safety, efficiency and order in its plants and operations.

(Emphasis added.)

G.E.'s retention of this right has not been without some opposition. At the negotiations that preceded the 1982–85 and 1985–88 CBAs, the Union proposed changes in this language, which would have limited or eliminated G.E.'s right to subcontract maintenance work. These Union proposals were unsuccessful. Nonetheless, the Union filed numerous grievances between 1981 and 1987 regarding G.E.'s subcontracting of maintenance jobs, and the Union three times went out on strike in support of these grievances.

Most of these subcontracting grievances followed immediately on the heels of one of G.E.'s "peak periods" for maintenance jobs. For two-to-three weeks in the summer and again for two-to-three weeks in late December/ early January, G.E. shuts down its production operations at the Cicero facility. It is during these shutdowns or "peak periods" that G.E. performs its major maintenance projects. G.E. often employs subcontractors to perform some of the many individual jobs involved in these major maintenance projects, which include servicing and replacing production machinery, installing and repairing heating units, and the like.

In pursuing one of its shutdown-related grievances in 1982, the Union requested a variety of information regarding the challenged subcontracts, including the "cost per man hour of work." In response, G.E. reiterated its "exclusive right to subcontract" contained in the CBA, and the matter appears to have ended there.

This case finds its genesis in a similar grievance filed in January, 1987. Again, the Union was grieving G.E.'s subcontracting during the late December/ early January shutdown. G.E. scheduled 64 maintenance jobs for that peak period in 1986–87. All but 12 of these jobs were designated by G.E. as "Priority 1," which meant that they could be done only during shutdown and that cost was irrelevant. A few of the other jobs were designated "Priority 2," which meant that they "should" be done during shutdown and that doing them during production would entail "greater cost." The remaining jobs had no priority designation.

About 60 of the 64 scheduled jobs actually were performed during the 1986–87 shutdown. G.E.'s regular employees performed about 46 of them, subcontractors performed about 11, and the remainder were performed by both G.E. employees and subcontractors. Although there was conflicting testimony before the ALJ as to

how many of the 11 subcontractor jobs could have been performed by G.E.'s regular maintenance employees, that number is no greater than three. Also, the record reveals that the vast majority of unit maintenance employees who were not on vacation during the 1986–87 shutdown worked overtime on the maintenance projects performed during that shutdown, and that all 11 of G.E.'s regular production employees who asked to work on the maintenance projects were brought over to help out.

On January 2, 1987, the Union filed a grievance protesting G.E.'s subcontracting during the 1986–87 shutdown. The grievance demanded that G.E. furnish the Union with a list of the subcontractors used, the jobs they performed, the cost of the individual jobs, and the identity of the bidders on these jobs. On January 16, G.E. and the Union held a "second-step" meeting on this grievance. (The CBA provided for a three-step grievance procedure, after which the grievance could go to arbitration if it involved an arbitrable matter under the CBA. Subcontracting was specifically exempted from the scope of arbitration.) At the second-step meeting, G.E. defended its decision to subcontract on the following grounds: its consistent and longstanding practice, protected by the CBA, of subcontracting during peak periods; all unit maintenance employees already were working at full capacity during the shutdown; much of the work had to be done during shutdown; and regular maintenance employees lacked the skills, knowledge and/or tools to perform some of the jobs.

At the subsequent third-step meetings held in February, 1987, G.E. basically repeated these same factors in defense of its decision to subcontract. At these meetings, G.E. provided the Union with some of the requested information, but refused to provide cost data. G.E. specifically and consistently asserted that cost data was irrelevant both to its decision to subcontract and to the Union's grievance protesting that decision. For its part, the Union asserted that G.E. should hire more maintenance employees, alleging that G.E. effectively had "replaced" unit maintenance employees with subcontractors by allowing attrition in the ranks of the maintenance employees. Union officials also asserted that they wanted G.E. to stop its practice of subcontracting altogether, that the Union had a right to all of the requested subcontracting information, and that without the cost information the Union would be unable to continue with the grievance procedure. At the meeting on February 12, the Union representative, in response to a question from G.E. as to why the Union needed the cost data, included in his answer the need to prepare for "upcoming negotiations." *Board Decision,* ALJ Decision at 12–14.[1]

It soon became clear to the Union that the cost data it wanted would not be forthcoming from G.E. Because arbitration was unavailable, the Union took its demand to the NLRB. The Union filed an unfair labor practice charge on February 27, 1987, alleging that G.E. unlawfully had refused to provide it with "information concerning certain subcontracting ... which is necessary to enable the [Union] to carry out its functions under the current collective bargaining agreement and the Act." In July, 1987, the Board's General Counsel issued a formal complaint based on the Union's charge and set the matter for hearing before an ALJ.

The ALJ hearing on the Union's charge took place in November, 1987. At that hearing, G.E. officials testified specifically that cost has never been a factor in G.E.'s CBA-protected decisions to subcontract, citing instead the reasons G.E. consistently offered to the Union, including especially that unit maintenance employees lacked the

---

1. G.E.'s representative at the February 12 meeting later testified before the ALJ that he "did not hear" the Union representative raise at that meeting future contract talks as a reason for wanting the cost information. The ALJ, however, chose to credit the Union representative's testimony that he did so state. *Id.* at 13 n. 7.

As the ALJ was in a better position than we to make such credibility determinations, we accept her finding, and will assume that at the February 12 meeting the Union representative raised the negotiation of future contracts as one reason for the Union's request for cost information.

skills, equipment and/or time to do the subcontracted jobs. Union officials, for their part, repeated their demand for the cost data, and one Union official testified that in pursuing grievances he "continuously" heard from G.E. representatives in defense of their subcontracting and other business decisions "the rhetoric that [G.E.] has to be competitive." *Id.* at 14.

Unsatisfied with G.E.'s stated reasons for subcontracting, the ALJ pressed G.E.'s representatives on this issue, and by so doing elicited the following additional evidence: 1) subcontracts are included in G.E.'s overall maintenance budget; 2) G.E. accepts competitive bids on subcontracts; 3) an internal G.E. worksheet used during the 1986–87 shutdown contains dollar entries as to the cost of some subcontracted jobs; 4) another internal G.E. worksheet used for a subcontracted janitorial job in 1982 includes an entry noting that the job was less costly if done by a subcontractor; 5) G.E. had a policy of retaining the number of regular maintenance employees needed on average rather than the number needed during peak periods at least in part because to do otherwise would be very inefficient and costly; and 6) at least one job was performed during the 1986–87 shutdown instead of during a production-time weekend because of cost considerations.

Citing this evidence, the ALJ concluded that G.E.'s contention that comparative labor cost played no part in its decisions to subcontract was a ruse. Based largely on the Union representative's testimony concerning what he "continuously" heard at grievance meetings, the ALJ rejected in a footnote G.E.'s argument that it had no obligation to turn over the information because it never raised cost as a defense. *Id.* at 23 n. 23. The ALJ also concluded that the requested cost information was sufficiently relevant both to "forthcoming contract negotiations" and to "at least part of bargainable portions of the subcontracting grievance" that its production was required. In another footnote, the ALJ rejected G.E.'s argument that the proffered "negotiations" rationale for the Union's request was premature and in bad faith, finding that preparation for negotiations was "among the purposes" for which the Union wanted the information. *Id.* at 24 n. 25. Finally, the ALJ concluded, as a kind of fallback position, that even if the Union did not give G.E. a sufficient, relevant reason for the information demand at the time it was first made, the fact that G.E. was apprised *at the hearing* that the information was "relevant for grievance-processing purposes" was enough to make G.E.'s "continuing refusal" to supply the information an unfair labor practice.

In a four-page decision and order, the Board summarily affirmed the ALJ's rulings, findings and conclusions. Notably, however, the Board did not affirm or rely on the ALJ's conclusion that G.E. was required to provide the information because it was relevant to the processing of the subcontracting grievance. Rather, the Board based its decision that G.E. had committed an unfair labor practice solely on the finding that the requested cost information was relevant to the negotiation of a successor agreement to the 1985–88 CBA. *Board Decision,* slip op. at 1–2. The Board ordered, among other things, that G.E. immediately furnish the Union with the requested cost information.

From this Board decision and order G.E. filed a timely petition for review in this court. The Board has cross-petitioned for enforcement of the order, and the Union has intervened. We have jurisdiction over G.E.'s petition, and over the Board's cross-petition, under §§ 10(e) and (f) of the Act, 29 U.S.C. §§ 160(e) and (f).

## II

■ As part of their duty to bargain in good faith, employers must often provide information requested by their bargaining adversary. *See NLRB v. Acme Indus. Co.,* 385 U.S. 432, 435–37, 87 S.Ct. 565, 567–68, 17 L.Ed.2d 495 (1967); *NLRB v. Truitt Mfg. Co.,* 351 U.S. 149, 76 S.Ct. 753, 100 L.Ed. 1027 (1956). That is not to say, however, that the Act requires an employer to lay open its books at any or every union request; certain requirements must be

**1168**

met. As the Supreme Court stated in *Detroit Edison Co. v. NLRB*, 440 U.S. 301, 314, 99 S.Ct. 1123, 1131, 59 L.Ed.2d 333 (1979), "A union's bare assertion that it needs information ... does not automatically oblige the employer to supply all the information in the manner requested. The duty to supply information under § 8(a)(5) turns upon 'the circumstances of the particular case.'" (quoting *Truitt Mfg.*, 351 U.S. at 153, 76 S.Ct. at 753.)

■ The primary requirement to trigger an employer's duty to turn over requested information is that the information be relevant to the union's performance of its duties to administer and police the CBA or to negotiate a new CBA (or both). *See Acme Indus.*, 385 U.S. at 437, 87 S.Ct. at 568; *Oil, Chem. & Atomic Workers Local Union No. 6–418 v. NLRB*, 711 F.2d 348, 358 (D.C.Cir.1983) ("*O.C.A.W.*").[2] The standard for relevance is most often viewed quite liberally so as to allow for broad disclosure of information. *See Acme Indus.*, 385 U.S. at 437 & n. 6, 87 S.Ct. at 568 & n. 6; *NLRB v. Pfizer, Inc.*, 763 F.2d 887, 889–90 (7th Cir.1985). Of course, broad disclosure is not unlimited disclosure; there are cases in which information that may be "relevant" in the broadest sense can nonetheless be withheld without violating the duty to bargain in good faith. *See generally NLRB v. Associated General Contractors of California, Inc.*, 633 F.2d 766, 770 (9th Cir.1980) ("Although only relevant information must be disclosed, a refusal to disclose even relevant information is not always a § 8(a)(5) violation."); *San Diego Newspaper Guild v. NLRB*, 548 F.2d 863, 868–69 (9th Cir.1977) (union's showing of "abstract, potential relevance" insufficient). Further, as the court stated in *Associated General*, "We must consider the employer's reasons for nondisclosure

and the negotiating conduct of the parties." 633 F.2d at 770.

In this case, the Board's conclusion that G.E.'s duty to bargain in good faith required it to provide the cost data had two operative parts. First, the Board concluded that the Union's demand was sufficient to trigger G.E.'s duty. Second, the Board concluded that costs were sufficiently relevant to require the provision of the requested data. These were primarily factual determinations, and as such they are conclusive if they are supported by substantial evidence in the record as a whole. 29 U.S.C. § 160(f); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951); *Lapham–Hickey Steel Corp. v. NLRB*, 904 F.2d 1180, 1184 (7th Cir.1990). To determine whether the Board's factual conclusions are adequately supported, we examine the whole record, "including the evidence opposed to the Board's view from which conflicting inferences reasonably could be drawn." *NLRB v. Emsing's Supermarket, Inc.*, 872 F.2d 1279, 1283 (7th Cir.1989); *NLRB v. Adam and Eve Cosmetics, Inc.*, 567 F.2d 723, 727 (7th Cir.1977). Our deference to the Board's view of the facts is substantial, but we must be wary not to allow our review to become "a mere rubber stamp substituting judicial abdication for judicial review. It is imperative that the reviewing court examine all of the evidence in context to ensure that the Board's findings fairly and accurately represent the picture painted by the record." *NLRB v. Harvstone Mfg. Co.*, 785 F.2d 570, 574–75 (7th Cir.1986) (quotation and citations omitted). To the extent that these determinations involve the interpretation of the Act, they will be upheld so long as they are rational, reasonable and consistent with the Act. *NLRB v. Financial Inst. Employees of America, Local 1182*, 475 U.S. 192, 202,

---

**2.** A union's request for information must also be "bona fide" and made in "good faith." *See J.I. Case Co. v. NLRB*, 253 F.2d 149, 153 (7th Cir. 1958); *Island Creek Coal Co.*, 292 N.L.R.B. No. 49 at 22 (1989). G.E. argues that the Board erred in not finding that the Union's request here failed this requirement. Given our resolution of the other issues in this case, we need not address this argument.

Further, in some cases, a union's asserted need for relevant information must be balanced against an employer's asserted confidentiality interests. *See Detroit Edison*, 440 U.S. at 314–20, 99 S.Ct. at 1130–34, and cases cited at 318 n. 14, 99 S.Ct. at 1132 n. 14. As G.E. has not raised secrecy or confidentiality concerns, neither will we address this issue.

106 S.Ct. 1007, 1012, 89 L.Ed.2d 151 (1986); *David R. Webb Co., Inc. v. NLRB*, 888 F.2d 501, 503 (7th Cir.1989).

Employing these standards, we determine that neither part of the Board's ruling can withstand review.

## A. The Union's Demand

As mentioned above, the Board modified the ALJ's ruling as to the valid grounds for the Union's demand, relying only on the Union's claim that the cost information would help it prepare for the next round of contract negotiations. The record reveals that this ground was first advanced by the Union at the third-step grievance meeting on February 12, 1987. The CBA in force at that time was not due to expire until June 26, 1988, and thus had over sixteen months yet to run. Further, according to the CBA, the earliest date at which either party could serve notice that it wished to terminate or modify the CBA, and thus the earliest date at which bargaining could commence, was March 26, 1988: thirteen months after the Union's demand. *See Board Decision*, ALJ Decision at 7–8. The Board dispensed with this timeliness problem as follows: "We find that the Union had specifically referred to this [negotiations] use of the information in its request, and that, *at least by the time of the hearing in this case*, those negotiations were sufficiently close at hand to require [G.E.] to provide the information." *Id.*, slip op. at 1–2 (emphasis added). The Board cited in support *Barnard Eng'g Co.*, 282 N.L.R.B. 617 (1987), which it claimed stood for the proposition that the Board can look to the situation as it exists at the time of the ALJ

hearing to find violation in an employer's "continuing refusal" to produce information.[3]

We begin by rejecting the Board's premise that the relevance inquiry allowed it to consider the state of affairs "by the time of the hearing" in assessing G.E.'s refusal to turn over the information. G.E. denied the Union's one-time demand for cost information in January/February, 1987. To determine whether this action was an unfair labor practice, the Union's proffered reasons for demanding the information, as well as G.E.'s motives for refusing that demand, must be examined as of the time of the demand and refusal. *Cf. New York Printing Pressmen and Offset Workers Union v. NLRB*, 538 F.2d 496, 501 (2d Cir.1976) (Board must examine reasons provided by employer at time it denied union's request for information, not explanation raised at hearing before the ALJ); *California Portland Cement Div., Calmat Co.*, 283 N.L.R.B. 1103, 1106 (1987) (in pressing information demand, Union cannot rely on bargaining rationale proffered for the first time at the ALJ hearing); *Burner Sys. Int'l, Inc.*, 273 N.L.R.B. 954, 960–62 (1984) (in defending unfair labor practice charge, employer may not justify conduct by relying on facts arising after the employer's action or on facts unknown to employer at time it acted). As another court stated in denying enforcement to an NLRB order that required a company to provide information requested by a union, "[W]e deal with the fact situation presented to the Company at the time it acted." *NLRB v. A.S. Abell Co.*, 624 F.2d 506, 513 n. 5 (4th Cir.1980).[4]

---

**3.** The Board's footnote explaining the concurring view of panel member Cracraft on this issue is revealing. The footnote states, "Member Cracraft believes that the request for information at [the time it was made during the grievance meeting] was not premature," and therefore she did not find it necessary to rely on *Barnard* and the "by the time of the hearing" notion. *Board Decision,* slip op. at 2 n. 3. By negative implication, this statement appears to admit that the other two Board members believed the request *was* premature when made, and therefore found it necessary to revert to their reading of *Barnard.*

**4.** We also note that there is no evidence in this case that the Union ever renewed its request for cost information linking it more closely, both in time and purpose, to contract negotiations. Although it is true that unions, like employees, are generally "not required to request ... data on more than one occasion or hound the employer when the information is not produced," *Harvstone Mfg.*, 785 F.2d at 578, renewed requests have been found in other cases to establish the relevance necessary to require employer disclosure when the initial request was insufficient. *See Island Creek*, 292 N.L.R.B. No. 49 at 25–30. *See also NLRB v. Pacific Grinding Wheel Co.*, 572 F.2d 1343, 1348 (9th Cir.1978) ("[S]ince the

Properly understood, neither *Barnard Eng'g,* nor the other cases cited to us by the Board in defense of its suggested "continuing refusal" argument, suggest otherwise. In *Barnard,* the ALJ ruled, and the N.L.R.B. affirmed, that the employer's failure to provide the requested information was a violation because the union had, at the time it made its requests, sufficient facts to support its stated reason for needing the information and a sufficient basis for seeking it (to determine whether to file a grievance). 282 N.L.R.B. at 620 (ALJ Decision). The ALJ's additional characterization of the union's series of letters asking for the information as a "continuing request" is therefore inapposite to our case, especially given that there was no question of timeliness in that case and the relevance of the requested information should have been "obvious" to the employer when the request was first made. *See id.* The context also makes clear the inapplicability of *Ohio Power Co.,* 216 N.L.R.B. 987 (1975), *enforced by mem.,* 531 F.2d 1381 (6th Cir.1976). There, the union requested subcontracting information—with the express exception of costs, *see id.* at 990—for grievance purposes. In the footnote here seized upon by the Board, the N.L.R.B. did not there hold that employer refusals of such requests are or should be considered "continuing." Rather, in response to an argument by the employer, the N.L.R.B. stated that the adequacy of the union's requests in that case must be judged in light of "the entire pattern of facts available to [the employer]"—our approach here—not just "the communications themselves." *Id.* at 990 n. 9. Similarly, in *O.C.A.W.,* 711 F.2d at 363 n. 40, the court's reference to the unions' "continuing request" came in the context of rejecting an argument by the employers that a change in wording between the "initial communication" of the unions' request and their subsequent clarifications was dispositive. Further, in *O.C.A.W.,* the unions' rationale for their series of requests, which they explained in "considerable detail," was relevant and timely when the requests were

made, *id.* at 361, and the information itself was "presumptively relevant," as it directly related to the health and safety of unit employees. *See infra* at 1171–72. Thus, none of these cases, nor a reasonable view of the duty to bargain in good faith imposed on employers by the Act, support the Board's position that it was proper in this case to assess the Union's one-time demand for nonunit information and G.E.'s refusal of that demand as of the date of the hearing.

■ Assessing the Union's demand when made, the record as a whole establishes that it was insufficient to trigger G.E.'s duty to provide the information. The context in which the demand was made is telling: the Union was pursuing one of its many, non-arbitrable grievances concerning shutdown subcontracting. Although we accept the ALJ's and Board's determination that the Union added to its primary grievance-related purposes the need to prepare for "upcoming negotiations," we cannot accept the conclusion that the addition of this rationale was sufficient standing alone to require G.E. to turn over the cost data. The demand was made over a year before bargaining could begin. The CBA did not provide for mid-term bargaining, nor does the record contain any evidence (i.e. specific testimony, bargaining history, etc.) that the parties nonetheless had begun to negotiate over a new contract or were preparing in earnest for such negotiations. *Cf. San Diego Newspaper Guild,* 548 F.2d at 868 & n. 10 (in limiting valid purposes union could have wanted information and eliminating any bargaining purpose, court relied in part on the fact that "there was no evidence of contract negotiation being carried on with the Union at the time of the request" and that the CBA had two years to run); *NLRB v. Goodyear Aerospace Corp.,* 497 F.2d 747, 751–52 (6th Cir.1974) (employer's refusal to furnish financial data was not an unfair labor practice as the parties were not engaged in "genuine negotiations" but

union never followed up on its request for data, we agree that there is no independent violation

of the company's duty to bargain resulting from its failure to produce this information.").

merely "sparring").[5] Moreover, the Union has at no time suggested that G.E. ever raised cost during prior bargaining battles over the retention of the subcontracting language in the CBAs, and the record would not support such a suggestion in any event. Thus, viewing the record evidence as to the circumstances that existed at the time the Union's negotiation-grounded demand was made, we conclude that the Union's demand was premature and insufficient.

**B. The Relevance of Cost**

■ Even if we accept the Board's "continuing refusal" argument or otherwise accept the Union's demand as timely and sufficient, enforcement of the Board's order must be denied because the record as a whole fails to support the Board's conclusion that subcontracting costs were sufficiently in issue to require the disclosure of the cost data. The Board ruled that the cost information was relevant to the Union's proffered negotiation purpose because the record established that cost factors played a "clear role" in G.E.'s subcontracting decisions. On that basis, the Board found no merit in G.E.'s contention that it was not required to provide the cost data even for negotiation purposes because it never raised costs in defense of its subcontracting practices. *Board Decision,* slip op. at 2–3. A full review of the precedents and the record reveals these conclusions to be unreasonable and unsupported.

Some information requested by unions is "presumptively relevant" because it relates directly to unit employees and their conditions of employment and therefore goes to the core of the employer-employee relationship. *See WCCO Radio, Inc. v. NLRB,* 844 F.2d 511, 514 (8th Cir.), *cert. denied,* 488 U.S. 824, 109 S.Ct. 72, 102 L.Ed.2d 49 (1988) (citing cases). Such information must be provided by employers unless they prove a lack of relevance. "On the other hand, when information not ordinarily pertinent to collective bargaining, such as information concerning nonunit employees, is requested by a union, relevance is not assumed. Instead the union must affirmatively demonstrate relevance to bargainable issues." *O.C.A.W.,* 711 F.2d at 359 (quotation and citations omitted). *See also Barnard Eng'g,* 282 N.L.R.B. at 619 ("But where the request is for information with respect to matters occurring outside the unit, the standard is somewhat narrower and relevance is required to be somewhat

---

**5.** Contrary to the Board's suggestion, our holding in *J.I. Case Co. v. NLRB,* 253 F.2d 149 (7th Cir.1958), does not foreclose the conclusion that the Union's demand in this case was premature. At issue in *J.I. Case* were a series of union requests for wage-related information. The union claimed that the wage for a particular job should change because the nature of job had changed. The CBA at issue specifically provided for the review of these wages in the event of "a significant change in the nature of a job," and established a grievance procedure for union complaints about these wages. *Id.* at 151. The union's requests stated that it needed "time study" information, which the employer admitted it used in determining wages, both for "contract administration" (determining whether to file a grievance) and for wage bargaining purposes. In discussing the first ground and the union's duty to "police and administer" the CBA, we stated, "The contention that the Union's right to data is limited to pending wage negotiations overlooks the fact that *collective bargaining is a continuing process....*" *Id.* at 153 (emphasis in original). Then, in rejecting an attempt by the employer to distinguish a case (*Taylor Forge & Pipe Works v. NLRB,* 234 F.2d 227 (7th Cir.

1956)), we stated, "The fact that negotiations are pending may be an important factor in considering the relevance of the requested data to Union bargaining needs, but it is not the sole consideration." We then concluded that the employer was required to turn over the information, ignoring the fact that the request was made long before expiration of the CBA, because *"the Union* in this case *was actually preparing for contract negotiations* the following January to which this data would be relevant." 253 F.2d at 155 (emphasis in original).

An examination of these three statements reveals that our holding here is not in conflict with our holding in *J.I. Case.* In the first statement, we pointed out that the union there had a valid, compelling purpose for information related to the "continuing process" of administering the CBA apart from any pending wage negotiations; in this case, the Board has limited the Union's valid purposes to negotiations. Second, we do not today rely on the lack of evidence of pending negotiations as our "sole consideration," as our analysis makes clear. Third, unlike in *J.I. Case,* the record in this case is devoid of evidence that G.E. and the Union were "actually preparing for contract negotiations."

more precise.") (quotation and citations omitted).

In this case, the Union demanded the dollar amounts that G.E. paid to outside subcontractors for certain jobs, information relating to a non-arbitrable, non-bargaining unit activity that G.E. had insured its right to continue with each successive CBA. Neither the Union nor the Board has endeavored to show that this information relates to "the core of the employer-employee relationship." Thus, the requested cost data does not fall within the presumption, and the Union had the burden to establish relevancy. *Western Massachusetts Elec. Co. v. NLRB* ("*WEMECO*"), 573 F.2d 101, 105–07 (1st Cir.1978) (subcontracting cost data not presumptively relevant; rather, union must show that it "was precisely relevant to the bargaining that took place").

One would expect the Union to attempt to meet this burden by coming forward with evidence that G.E. at some point raised cost in defense of its subcontracting practice, either in the context of defending grievances or of bargaining to retain subcontracting as a management right in the CBAs. Indeed, some support exists for the notion that the Union was *required* to make such a showing. *WEMECO*, 573 F.2d 101, 107–110 (1st Cir.1978) (enforcing Board order that one utility was required to provide the requested subcontracting cost data because that utility defended its need to subcontract on cost and "economic necessity" grounds, but denying enforcement to Board order requiring another utility to provide the same data because "the Board does not and, the record indicates, cannot point to any statement, compromise or suggestion attributable to [the second utility] that raised costs as an issue"); [6] *Calmat Co.*, 283 N.L.R.B. at 1105 (ALJ

denied union demand for information in part because employer "never justified its subcontracting on the basis of cost"). *See also Southwestern Bell Tel. Co.*, 262 N.L.R.B. 928 (1982) ("*SW Bell II*"); *Southwestern Bell Tel. Co.*, 173 N.L.R.B. 172 (1968) ("*SW Bell I*").[7] At the very least, the case law reveals that this is the showing most often made when unions successfully have demanded financial data from employers, the concern being to force employers to substantiate, and allow unions independently to review, economic claims. *See, e.g., Truitt Mfg.*, 351 U.S. 149, 76 S.Ct. 753; *WEMECO*, 573 F.2d at 107; *C–B Buick, Inc. v. NLRB*, 506 F.2d 1086, 1091 (3d Cir.1974).

Viewed as either a requirement or as the most relevant consideration, that G.E. raised costs as a defense to subcontracting is not supported by the record. The testimony and documentary evidence in this case reveal that at no time in the grievance process did G.E. offer comparative cost as a defense. Instead, G.E. consistently offered other reasons or defenses, including especially that unit maintenance employees lacked the time, skills or tools to do the jobs, most of which could only be done during shutdown. The ALJ and (apparently) the Board rejected this evidence based primarily on the Union representative's testimony that G.E. had at many, unspecified times in the past stated at meetings concerning grievances that it needed to stay "competitive." As we have held in an analogous context, however, an employer's general statements about "competitive disadvantage" cannot be transmogrified into an explicit evocation of cost as a defense, thereby triggering the employer's obligation to turn over financial data. *Harvstone*, 785 F.2d at 575. Further, G.E.'s statement during the ALJ hearing that cost

---

**6.** This reading of *WEMECO* was ratified by the First Circuit in *NLRB v. Davol, Inc.*, 597 F.2d 782, 788 (1st Cir.1979): "In [*WEMECO*] we held that information regarding subcontracting costs need be disclosed only when such costs are put into contention."

**7.** We note that there is some disagreement among the parties on this issue. G.E., unsurprisingly, argues that the Union was required to

show that G.E. raised costs. The Board, in its brief, appears to agree, as it states at one point that "the question is whether [G.E.] raised cost as an issue." Board Brief at 25. The Union, for its part, argues that it need not generally be shown that the employer raised cost as a defense to make cost information relevant. Our resolution immediately following obviates the need to resolve this debate.

plays a part in its decision to employ the number of maintenance employees it needs on average rather than at peak periods cannot properly be construed as an evocation of comparative labor cost as a defense to subcontracting. *See SW Bell I,* 173 N.L.R.B. 172 (employer admitted that among its reasons for its long-standing practice of contracting-out certain "peak load" work were the desire to avoid the "uneconomical" use of more overtime and "to effect economies through the avoidance of overtime work"; the N.L.R.B. ruled that these statements were not a sufficient evocation of costs to require the employer to provide subcontracting cost data to the union). *See also SW Bell II,* 262 N.L.R.B. 928, 933 (ALJ decided, and N.L.R.B. affirmed, that employer did not violate Act by refusing to provide cost data on its practice of subcontracting sporadic, temporary jobs, and the ALJ stated "the work was not to be repeated and [the employer] would have been required to hire new employees if it did not subcontract, and this the Board or an arbitrator would not force it to do").[8] In sum, the evidence as a whole fails to support the conclusion that G.E. raised cost considerations in explaining or defending its peak period subcontracting.

This failure of proof is not ameliorated by the other evidence adduced by the ALJ as to G.E.'s budgetary and record-keeping practices. The two internal worksheets examined and relied upon by the ALJ, one of which referred to an unrelated, nonunit project in 1982, establish nothing other than the wholly unsurprising fact that G.E. keeps track of the costs on its subcontracted jobs, as well as on the overall maintenance projects. Further, there is no evidence that in granting a project a priority designation (i.e. "should do during shutdown/ can do at another time but greater cost"), G.E. was referring to the comparative cost of using regular maintenance

workers versus subcontractors, as much as the costs associated with attempting the project during production versus during shutdown.[9] Similarly, that G.E. endeavors to complete its projects "within budgetary constraints" and that it takes bids on subcontracted jobs are insufficient to support the Board's decision to presume comparative labor cost-driven subcontracting in the absence of an evocation of this defense by G.E.

Were it simply that the evidence established a set of reasons that G.E. raised and/or relied upon in deciding to subcontract some jobs during shutdown and the Board picked cost as an operative one, we, of course, would defer. *See Universal Camera,* 340 U.S. at 488, 71 S.Ct. at 464 (reviewing court is obligated to uphold Board's choice between "fairly conflicting views" despite the fact that court "would justifiably have made a different choice had the matter been before it *de novo* "). In this case, however, the ALJ and Board found that G.E. raised cost and/or that costs played a "clear role" in G.E.'s subcontracting decisions despite and counter to the weight of the evidence of record. Thus, the Board's conclusion that cost was sufficiently relevant and in issue to require disclosure of the requested data is rejected. *Cf. Atlas Metal Parts Co., Inc. v. NLRB,* 660 F.2d 304, 309–10 (7th Cir.1981) (denying enforcement to Board order requiring the provision of subcontracting information because insufficient showing of relevance); *San Diego Newspaper Guild,* 548 F.2d 863 (no violation for employer to withhold information because union failed to establish relevance); *New York Tel. Co.,* 299 N.L.R.B. No. 44, ALJ Decision at 36–52 (1990) (employer not required to provide cost information regarding subcontracts because union failed to establish relevance).

---

**8.** The Board's attempt to distinguish these *Southwestern Bell* cases on factual grounds is unconvincing. *See Board Decision,* slip op. at 3 n. 4. We also note that the Board's reliance on *NLRB v. Westinghouse Broadcasting and Cable, Inc.,* 849 F.2d 15, 22–23 (1st Cir.1988), wherein the court held that the substitution of an entire

unit with subcontractors based on the employer's desire to reduce its "body count" was a mandatory subject of bargaining, is misplaced.

**9.** The same can be said of the evidence that G.E. scheduled one job for shutdown rather than for a weekend during production.

III

In January–February, 1987, the Union demanded that G.E. turn over, among other things, cost data on certain subcontracts. The record as a whole reveals that, at the time the demand for the financial information was made, G.E. had every right to refuse it: the Union's demand was premature and uncompelling, and comparative subcontracting costs were not on the table. Thus, for the reasons more fully explained above, the Board's finding that G.E. violated sections 8(a)(5) and 8(a)(1) of the Act by refusing to disclose the requested cost data was unreasonable and unsupported by substantial evidence. Accordingly, G.E.'s PETITION FOR REVIEW IS GRANTED, and ENFORCEMENT of the Board's order is DENIED.