**CROWLEY MARINE SERVICES, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 00–1036.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 15, 2000.

Decided Dec. 22, 2000.

Kenneth W. Anderson argued the cause for petitioner. With him on the briefs was Eugene Scalia.

Richard A. Cohen, Attorney, National Labor Relations Board, argued the cause for respondent. With him on the brief were Leonard R. Page, General Counsel, and Aileen A. Armstrong, Deputy Associate General Counsel. Frederick L. Cornnell, Jr., Attorney, entered an appearance.

Before: EDWARDS, Chief Judge, SENTELLE and HENDERSON, Circuit Judges.

Opinion for the Court filed PER CURIAM.

Dissenting opinion filed by Circuit Judge KAREN LeCRAFT HENDERSON.

PER CURIAM:

The National Labor Relations Board ("NLRB" or "Board") found, in agreement with the Administrative Law Judge, that the petitioner, Crowley Marine Services ("Crowley"), violated sections 8(a)(5) and (1) of the National Labor Relations Act ("NLRA") by refusing to provide the Inland Boatmen's Union of the Pacific ("IBU" or "Union") with a copy of an arbitration award involving Crowley Petroleum Transport, Inc. and the Seafarers International Union ("SIU"). *See Crowley Marine Services, Inc.*, 329 N.L.R.B. No. 92, at 10, 1999 WL 1046770 (Nov. 10, 1999). The Union had reason to think that the disputed arbitration award addressed the manning of a tanker that replaced a Union-serviced barge; therefore, the award was relevant to the Union's assessment of how best to protect the interests of their affected bargaining unit members. The Board specifically found that Union representatives believed that the alleged work-syphoning arrangement might be in violation of articles 1, 2 and 38 of its collective bargaining agreement with the petitioner. *See id.* at 9. The Board therefore ordered Crowley to furnish the Union with a copy of the arbitration award. Crowley argues that the Board's order is unjustified, because the arbitration award is irrelevant to the Union's legitimate interests under the NLRA. We reject Crowley's claim.

 There is no doubt that, on the record before us, the Board was fully justified in finding merit in the Union's request for the information in connection with a possible *grievance claim.* Substantial evidence supports the Board's determination that the Union communicated to Crowley that the arbitration award was reasonably relevant to pending and possible future grievance claims. *See, e.g., id.* at 5 (finding that the Union explained the relevance of its request in written correspondence). As the Board explained, the information was sought and needed "to enable the Union to make an informed judgement [sic] about pursuing [contract grievance] remedies." *Id.* at 8. Crowley argues, convincingly, that the record does not support a finding

that the requested information should be given to the Union to support future contract negotiations or a possible recognition demand. This is beside the point, however, because the information was properly sought in connection with possible contract grievance claims. Accordingly, the Board did not err in determining that the information sought should have been provided to the Union.

■ An employer's duty to bargain in good faith with a labor organization representing its employees has long been acknowledged to include a duty to supply the union with requested information that will enable the union to perform properly its duties as a bargaining representative. This duty "undoubtedly extends to data requested in order properly to administer and police a collective bargaining agreement." *Oil, Chemical & Atomic Workers Local Union v. NLRB*, 711 F.2d 348, 358 (D.C.Cir.1983).

■ Moreover, the Union was not required to show conclusively that the information it sought was technically "relevant" or that its request was based on a meritorious grievance. Rather,

> [t]he fact that the information is of probable or potential relevance is sufficient to give rise to an obligation ... to provide it. Under this "discovery-type standard," *NLRB v. Acme Industrial Co.*, 385 U.S. at 437, 87 S.Ct. at 568, " 'relevant' is synonymous with 'germane' " and, in the absence of some valid countervailing interest, an employer must disclose information requested by a union as long as that information has a bearing on the bargaining process. *Local 13, Detroit Newspaper Printing & Graphic Communications Union v. NLRB*, 598 F.2d 267, 271–72 (D.C.Cir. 1979).

*Oil, Chemical & Atomic Workers*, 711 F.2d at 359–60 (footnotes omitted).

■ Under this well-established case law, not much is required to justify a union's request for information that is re-

lated to its bargaining unit representation functions. And the judgment of the Board on this score is entitled to "great deference," because "[d]etermining whether a party has violated its duty to 'confer in good faith' " is "particularly within the expertise of the Board." *Local 13, Detroit Newspaper Printing & Graphic Communications Union*, 598 F.2d at 272. Substantial evidence in the record supports the Board's conclusion that the Union met the required showing that the requested information was related to possible contract grievance claims.

Accordingly, it is hereby ordered that Crowley's petition for review is denied, and the Board's cross-application for enforcement is hereby granted in accordance with this opinion.

KAREN LeCRAFT HENDERSON, Circuit Judge, dissenting:

> His reasons are as two
> grains of wheat hid
> in two bushels of chaff; you
> shall seek all day ere you find
> them, and when you have them,
> they are not worth the search.

William Shakespeare

*The Merchant of Venice*, Act I, sc. i.

The court's per curiam opinion knocks down the modest, but real, requirement that a union requesting information from an employer explain, *at the time of its request*, the relevance, or at least potential relevance, of information not ordinarily pertinent to its role as bargaining representative. In its place, the court leaves a flattened, if not phantom, hurdle. Accordingly, and for the reasons set forth below, I would grant the petition for review.

**I. Background**

The petitioner, Crowley Marine Services (CMS), is a subsidiary of Crowley Maritime Corporation (CMC), which through

various subsidiaries owns and operates tugs, barges, tankers and other ocean-going vessels on the east and west coasts of the United States. CMS primarily services the west coast, operating tug and barge service along the Alaskan coast and in the Puget Sound and San Francisco areas. Its San Francisco operations involve the loading and discharge of oil barges. It employs locally-based tankermen[1] to perform this work.

The Inlandboatmen's Union of the Pacific (IBU or Union) represents the tankermen pursuant to a collective bargaining agreement with CMS. Article 1 of the agreement recognizes the IBU as the exclusive bargaining representative of CMS tankermen who work in northern California and provides for work preservation, prohibiting CMS from reassigning or transferring work to non-bargaining unit employees. Article 2 limits the scope and geographical jurisdiction of the agreement to the loading and unloading of CMS "barges operating in Northern California, south to and including Morro Bay; north to Coos Bay and split discharges involving the Coos Bay Oregon Ports of Call and Columbia River area." JA 126. Article 38, entitled "Favored Nations Clause,"[2] provides that

> Crowley Marine Services, Inc. (formerly Harbor Tug and Barge Company) agrees that for the life of this Agreement will not be able [sic] a participant in or contribute any assets, equipment under their control, nor employees to any company, partnership, or joint venture which intends or is tended to compete with or replace the tug, barge and towing services which are presently offered or have been offered in the past by Crowley Marine Services, Inc. ... or which would have the effect of reducing the amount of work available to the Bargaining Unit.

JA 150–51.

Before June 30, 1997 Tosco Oil Company (Tosco), a petroleum and refining company, time chartered the services of Barge 450–6 owned by CMS. Tosco used Barge 450–6 to transport petroleum products from its Avon facility in San Francisco to its refinery operations in southern California. Under the time charter, CMS operated the barge. It loaded the barge at the Avon facility using San Francisco-based tankermen represented by the IBU. It then towed the barge to Tosco's facility in southern California, where it was unloaded by tankermen who worked for Crowley Towing and Transportation Company (CT&T), another subsidiary of CMC, and who were represented by the SIU. JA 176.

Around March, 1997 Tosco bought Union Oil Company of California (Unocal), including its Rodeo refinery in the San Francisco area and three tankers. Tosco sold two of the tankers, the Coast Range and the Blue Ridge, to Crowley Petroleum Transport, Inc. (CPTI), a newly created subsidiary of CT&T. Tosco then entered into a time charter with CPTI. Under the time charter, CPTI provided the vessel (the Coast Range) and crew to transport Tosco oil and refinery products from the

---

1. The term "tankermen" is somewhat of a misnomer. Tankermen work on barges, not tankers. They are land-based and do not travel with or aboard the barge as it travels between loading and unloading locations. By contrast, the licensed (and unlicensed) individuals who work on tankers, which are deep water vessels, travel aboard the tanker and work at both the loading and unloading destinations. See JA 31–33.

2. According to the record, the Favored Nations Clause represented a compromise designed to accommodate two competing interests. CMS wanted assurances that the Union would "not undercut [the] labor agreement with ... any competing companies." JA 41 (testimony of Marina Secchitano, IBU Regional Director). Part A of the Favored Nations Clause requires the Union "to equalize the total IBU labor operating costs" if the Union enters into an agreement with another company. JA 150. In return for this "bitter pill to swallow," CMS would not "put [the Union] out of work by bringing someone in to do th[e] work." JA 40–41.

Rodeo and Avon facilities to southern California. The twelve unlicensed crew members of the Coast Range were represented by the Seafarers International Union (SIU) and the eight licensed officers aboard the Coast Range were represented by the American Maritime Officers. Although the record does not establish why Tosco chose to time charter the Coast Range in lieu of renewing its time charter of Barge 450–6, one witness for CMS (Norman George, CPTI's manager of tanker operations) testified before the ALJ that the Coast Range had more than twice the carrying capacity of Barge 450-6 as well as a faster steaming time. Additionally, the tanker was fitted with a vapor recovery system and an inert gas system, both required for use at the Rodeo facility.[3] *See* JA 110–11.

As a result of Tosco's decision not to renew its time charter of Barge 450–6, CMS tankermen based in San Francisco ceased work at Tosco's Avon facility. CMS laid off one tankerman, Eugene S. Tracy, and reassigned Barge 450–6 to Alaska. On July 15, 1997 Tracy filed a grievance claiming that CMS laid him off "due to Crowley shifting the work that [Tracy] was formerly doing on the 450–6 to one of the new... tankers that Crowley purchased from Tosco." JA 166. His grievance asserted that CMS's actions violated articles 1 and 38(B) of the collective bargaining agreement and he sought reinstatement and back pay. On August 7, 1997 the IBU filed a generic grievance to cover all of its members. Its grievance asserted that the "Company [designated therein as CMS] violated the agreement when [it] refused to bargain the effects of this change and when [it] hired non-IBU crews to perform our work, displacing the

tug and barge and towing services with tankers." JA 167.

By letter dated August 21, 1997, the petitioner denied Tracy's grievance. The letter explained that "CMS did not shift the work that was formerly performed by Barge 450–6 to one of the new oil tankers that a separate company, Crowley Petroleum Transport, Inc. (CPTI) purchased from TOSCO.... It is our understanding that TOSCO, in light of its new needs, decided that Barge 450–6 was not suitable." JA 168. CMS also noted in the letter that it had transferred Barge 102 to the west coast and thus had not reduced its barge operations. By separate letter also dated August 21, 1997, CMS denied the IBU's grievance on two grounds. First, it explained that the grievance was untimely. Second, CMS found the grievance without merit because it was not CMS that shifted the work formerly performed by Barge 450–6 to the tanker operated by CPTI. The letter explained that "CPTI is a separate company and in a substantially different type of business than the barge transportation engaged [sic] by CMS." JA 170.

On November 21, 1997 the IBU sent CMS a letter requesting that the parties take the "IBU grievance to arbitration to decide if the Company violated the Tankermen Agreement when [it] replaced the tug and barge service on the TOSCO run with [its] tankers." JA 171. The letter explained:

> Your position has been that the grievance was untimely. As I have pointed out to you, the Company has not been forth coming with information on this issue. In fact, the Company did not come to us and inform us they would be doing this. I have tried to get more information from you on occasion and you have indicated "you do not know".

---

**3.** While the ALJ acknowledged George's testimony detailed the Coast Range's advantages over Barge 450–6, she concluded that there was no affirmative evidence that Barge 450–6 lacked the same. Despite the absence of evidence to the contrary, she rejected George's statement that Barge 450–6 did not have an inert gas or a vapor recovery system because "there were no predicates presented for this surmise." *Crowley Marine Servs., Inc.*, 329 N.L.R.B. No. 92, at 6, 1999 WL 1046770 (Nov. 10, 1999). She then concluded that George's "surmise works to impede his credibility." *Id.*

How can the Union be expected "to know" information regarding the purchase of the tankers and what the Company intended to do with the tankers when you, Manager of Labor Relations, don't even know.

JA 171. The penultimate paragraph contained the critical request for information: "Please provide me with a copy of the arbitration with the SIU that deals with the crewing of these ships [the tankers] at your earliest convenience." JA 171.

By letter dated December 10, 1997, CMS reiterated its position that the IBU grievance was untimely. With respect to the IBU's request for the SIU arbitration award, CMS stated that it was "at a loss to understand the relevance of such a request." JA 172. It explained that "[t]he crewing of such blue water vessels should not be any particular concern to a union representing barge tankerman." JA 172. The letter asked the IBU "to explain... why an arbitration decision on the crewing of a vessel on which the IBU has no recognition or other claim could possibly be relevant to the IBU." JA 172.

Instead of explaining, the IBU, on February 9, 1998, filed an unfair labor practice charge, alleging that "the... employer [designated therein as CMS]... refused to provide information requests by the union relevant to a labor dispute." JA 3. Four days later the IBU sent a letter to CMS formally demanding, *inter alia*, the SIU arbitration award. The letter explained:

It has come to our attention that the Company was claiming the work was given to the SIU as a result of an arbitration. I would like to know what contract the grievance that led to arbitration was filed under, whether it was the tug and barge operation or the ship operation that claims were made under. It is important to determine whether the Company provided information to another Union that should have been provided to us. If so, under what circumstances was this information provided that led the Union to believe a contract violation occurred. As you know, we were not given information in advance of the transfer of equipment, and the Company is claiming that the tug and barge operation was not replaced by the tanker operation.

JA 173. The petitioner responded by letter dated March 10, 1998. Thomas P. Baldwin, CMS's manager of labor relations, wrote: "I am unclear, and you still have not explained to me, why an arbitration decision on crewing of a vessel on which the IBU has no recognition or any other claim, could be relevant to the IBU. The oil tanker operation, Crowley Petroleum Transport, Inc. (CPTI) is a deep-sea company and is a completely separate company from Crowley Marine Services, Inc. (CMS). The IBU–San Francisco Region represents shore-based tankermen in San Francisco." JA 175. The Union did not respond to the letter.

The National Labor Relations Board (NLRB or Board) issued a Complaint and Notice of Hearing on April 30, 1998, alleging that CMS violated section 8(a)(1) and (5) of the National Labor Relations Act by refusing, beginning about December 10, 1997, to provide the IBU with a copy of the arbitration award between *the petitioner*[4] and the SIU. JA 8. After a hearing, the ALJ found that the Union "met its burden of establishing the potential relevance of the [SIU Arbitration Award] under the liberal discovery standard applied in these cases." *Crowley Marine Servs., Inc.*, 329 N.L.R.B. No. 92, at 8, 1999 WL 1046770 (Nov. 10, 1999). The ALJ held that CMS's "own comments led the Union to reasonably believe the SIU arbitration award contained information that would indicate if it should pursue its belief that articles 1, 2, and 38 of the collective-bargaining agreement had been violated by [CMS] when it terminated the barge oper-

---

4. The Board incorrectly stated that the arbitration award was between *CMS* and the SIU. Instead it involved *CPTI* and the SIU. *See infra* at 1303 & n.10.

ation[5] and handled the business with the tanker staffed by SIU members." *Id.* The ALJ ordered CMS to furnish the Union a copy of the SIU arbitration award and "all information requested by the Union on and after November 21, 1997, concerning the SIU arbitration award." *Id.* at 10. On November 10, 1999 the NLRB issued an order affirming the ALJ's rulings, findings and conclusions. CMS petitioned for review by this court and the NLRB cross-petitioned for enforcement.

## II. Analysis

Review of a Board order is deferential. The court applies the substantial evidence test to the Board's findings of fact and application of law to the facts, *see NLRB v. United Ins. Co.*, 390 U.S. 254, 260, 88 S.Ct. 988, 19 L.Ed.2d 1083 (1968); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951), and accords due deference to the reasonable inferences that the Board draws from the evidence, *see Peoples Gas Sys., Inc. v. NLRB*, 629 F.2d 35, 42 (D.C.Cir.1980), regardless whether the court might have reached a different conclusion de novo. *See Universal Camera Corp.*, 340 U.S. at 488, 71 S.Ct. 456.

The duty to bargain collectively, imposed upon an employer by section 8(a)(5) of the National Labor Relations Act, includes a duty to supply the union with " 'requested information that will enable [the union] to negotiate effectively and to perform properly its other duties as bargaining representative.' " *Oil, Chem. & Atomic Workers Local Union v. NLRB*, 711 F.2d 348, 358 (D.C.Cir.1983) (quoting *Local 13, Detroit Newspaper Printing and Graphic Communications Union v. NLRB*, 598 F.2d 267, 271 (D.C.Cir.1979)); *see Detroit Edison Co. v. NLRB*, 440 U.S. 301, 303, 99 S.Ct. 1123, 59 L.Ed.2d 333 (1979); *NLRB v. Acme Indus. Co.*, 385 U.S. 432, 437, 87 S.Ct. 565, 17 L.Ed.2d 495

(1967). The obligation to furnish relevant information is " 'rooted in recognition that union access to such information can often prevent conflicts which hamper collective bargaining,' and it undoubtedly extends to data requested in order properly to administer and police a collective bargaining agreement as well as to requests advanced to facilitate the negotiation of such contracts." *Oil, Chem. & Atomic Workers Local Union*, 711 F.2d at 358 (quoting *Florida Steel Corp. v. NLRB*, 601 F.2d 125, 129 (4th Cir.1979)). "That is not to say, however, that the Act requires an employer to lay open its books at any or every union request; certain requirements must be met." *General Elec. Co. v. NLRB*, 916 F.2d 1163, 1167–68 (7th Cir. 1990). "Each case must turn upon its particular facts." *NLRB v. Truitt Mfg. Co.*, 351 U.S. 149, 153–54, 76 S.Ct. 753, 100 L.Ed. 1027 (1956) ("The inquiry must always be whether or not under the circumstances of the particular case the statutory obligation to bargain in good faith has been met.").

The first question is always one of relevance. *See Emeryville Research Ctr., Shell Dev. Co. v. NLRB*, 441 F.2d 880, 883 (9th Cir.1971). The relevance threshold is low so as to permit broad disclosure of information. *See General Elec. Co.*, 916 F.2d at 1168. Broad disclosure, however, is not unlimited disclosure. *See id.* "A union's bare assertion that it needs information ... does not automatically oblige the employer to supply all the information in the manner requested." *Detroit Edison Co.*, 440 U.S. at 314, 99 S.Ct. 1123. In fact, "information that may be 'relevant' in the broadest sense can nonetheless be withheld without violating the duty to bargain in good faith." *General Elec. Co.*, 916 F.2d at 1168. The employer's duty depends on the " 'probability that the desired information [is] relevant, and that it [will] be of use to the union in carrying out its statuto-

---

**5.** The ALJ incorrectly stated that *CMS* terminated the barge operation. In fact Tosco, CMS's customer, terminated the barge operation by not renewing its time charter of Barge 450–6.

ry duties and responsibilities.'" *Oil, Chem. & Atomic Workers Local Union,* 711 F.2d at 359 (quoting *NLRB v. Acme Indus. Co.,* 385 U.S. 432, 437, 87 S.Ct. 565, 17 L.Ed.2d 495 (1967)).

"Certain types of information are 'so intrinsic to the core of the employer-employee relationship' that they are presumptively relevant. 'Conversely, when the requested information is not ordinarily pertinent to a union's role as bargaining representative, but is alleged to have become pertinent under particular circumstances, the union has the burden of proving relevance before the employer must comply.'" *NLRB v. George Koch Sons, Inc.,* 950 F.2d 1324, 1331 (7th Cir.1991) (citations omitted). Information about nonunit employees is not ordinarily pertinent to a union's role as a bargaining representative. *See Oil, Chem. & Atomic Workers Local Union,* 711 F.2d at 359 (" '[W]hen information not ordinarily pertinent to collective bargaining, such as information concerning nonunit employees, is requested by a union, relevance is not assumed.'") (quoting *Press Democrat Publishing Co. v. NLRB,* 629 F.2d 1320, 1324 (9th Cir. 1980)); *George Koch Sons, Inc.,* 950 F.2d at 1331 ("[O]ther courts of appeals have held that a union's request for information about *employees* with whom a union does not have a bargaining relationship is not presumptively relevant.") (emphasis original). Likewise, information pertaining to the operations of employers with whom the union has no bargaining relationship is not ordinarily relevant. *See George Koch Sons, Inc.,* 950 F.2d at 1331.

Because the information the IBU requested involved nonunit employees represented by the SIU and employed by CPTI,[6] the IBU had a duty to " 'affirmatively demonstrate relevance to bargainable issues,'" *Oil, Chemical & Atomic Workers Local Union,* 711 F.2d at 359 (quoting *Press Democrat Publishing Co. v. NLRB,* 629 F.2d 1320, 1324 (9th Cir.1980)), although it need not demonstrate that the SIU arbitration award was " 'certainly relevant or clearly dispositive of the basic . . . issues between the parties.'" *Id.* (quoting *Westinghouse Elec. Corp. v. International Union of Electrical Workers,* 238 N.L.R.B. 102, 107, 1978 WL 8089 (1978)); *see also United States Testing Co. v. NLRB,* 160 F.3d 14, 19 (D.C.Cir.1998), *reh'g and suggestion for reh'g en banc denied* (Jan. 20, 1999). Under the "discovery-type standard," *Acme Indus. Co.,* 385 U.S. at 437, 87 S.Ct. 565, " 'relevant' is synonymous with 'germane' and, in the absence of some valid countervailing interest," the company had a duty to disclose the information so long as it had a bearing on the bargaining process. *Oil, Chem. & Atomic Workers Local Union,* 711 F.2d at 360 (citations omitted).

The Board ruled that the Union affirmatively explained the relevance of the SIU arbitration award. It first noted that an unnamed CMS official informed the Union's national president that the SIU award was a product of arbitration. *See Crowley Marine Services, Inc.,* 329 N.L.R.B. No. 92, at 8, 1999 WL 1046770 (Nov. 10, 1999). Next, the Board found that CMS failed to inform the Union of the pending change in operation of Barge 450–6 and that the SIU arbitration award demonstrated that it had provided information to another union. *See id.* Third, the Board opined that any information about the contract under which the SIU pursued its grievance against, presumably, CT&T[7] would help the Union negotiate changes in *its* collective bargaining agreement with CMS. *See id.* at 8–9. Next, the Board

---

6. And there can be no doubt that the IBU knew at the time of its request that the information it sought involved non-unit employees represented by the SIU. *See* JA 171. The IBU also knew that the non-unit employees represented by the SIU were employed by CPTI, not CMS. *See* JA 170.

7. Although the record does not reflect the target of SIU's grievance, its collective bargaining agreement was with CT&T.

hypothesized that since the Union had a duty to police its collective bargaining agreement with CMS, the fact that CPTI was CMS's "affiliate" alerted the Union as to whether it had a claim under the work preservation clause of its own agreement. *See id.* Finally, the Board thought that the SIU arbitration award would assist the Union in deciding "whether to make a claim for the work." *Id.* at 9 (explaining that "the information may be later used for subsequent work demands").

Although we give "great weight" to the Board's determination on the relevance of requested information, *Oil, Chemical & Atomic Workers Local Union,* 711 F.2d at 360, our review is not "'a mere rubber stamp substituting judicial abdication for judicial review. It is imperative that the reviewing court examine all of the evidence in context to ensure that the Board's findings fairly and accurately represent the picture painted by the record.'" *General Elec. Co.,* 916 F.2d at 1168 (quoting *NLRB v. Harvstone Mfg. Co.,* 785 F.2d 570, 574–75 (7th Cir.1986)); *see Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951); *Time Warner Cable v. NLRB,* 160 F.3d 1, 3 (D.C.Cir. 1998). More important, we must examine the reasons the Union proffered *at the time of the demand* for the information. *See George Koch Sons, Inc.,* 950 F.2d at 1330; *General Elec. Co.,* 916 F.2d at 1169; *NLRB v. A.S. Abell Co.,* 624 F.2d 506, 513 n. 5 (4th Cir.1980) ("[W]e deal with the fact situation presented to the Company at the time it acted."). "'[O]nly after an employer has had an opportunity to consider the basis for a union's information or bargain-

ing demand can the employer violate the NLRA by rejecting the demand.'" *Hertz Corp. v. NLRB,* 105 F.3d 868, 873 (3d Cir.1997) (quoting *NLRB v. United States Postal Svc.,* 18 F.3d 1089, 1102 n. 7 (3d Cir.1994)). The court must look at the record as a whole as it existed when the Union made its demand. *See United States Testing Co.,* 160 F.3d at 19 ("[C]ontext is everything."); *General Elec. Co.,* 916 F.2d at 1170.

Viewing the record at the time of the IBU's demand, I fail to find any evidence to support the Board's conclusion that the *Union* affirmatively *and timely* explained the relevance of its request. Not one of the facts and theories of relevance posited *by the Board* was made known to CMS, much less communicated *by the Union* at the time of its demand. Before filing the unfair labor practice charge, the Union had made only one request for the SIU arbitration award, in the November 21, 1997 letter[8] to CMS, and the letter constitutes the Union's sole attempt to obtain the information before filing an unfair labor practice charge.[9] The letter gave *no* reason for the IBU's request. *See supra* at 1299–1300. The Board, however, cannot supply reasons *nunc pro tunc* and *post litem motam* to conclude that the Union met its burden to affirmatively demonstrate the relevance of the SIU arbitration award at the time it requested the information. Even the February 13, 1998 "formal demand," made after the unfair labor practice charge was filed, did not give the reasons supplied years later by the Board.[10]

---

8. The Board found, however, that "[t]he Union's November 21 letter indicates it tried to get the information from [CMS] on previous occasions without success." *Crowley Marine Services, Inc.,* 329 N.L.R.B. No. 92, at 9, 1999 WL 1046770 (Nov. 10, 1999). Nothing in the letter or elsewhere in the record indicates that the Union had previously requested the arbitration award.

9. Marina Secchitano, the IBU's regional director, confirmed at the hearing that "any discussion with Crowley" about the SIU arbi-

tration award request was contained in the correspondence and that she had no "actual discussion with anyone from Crowley about the arbitration award." JA 45.

10. Moreover, the Board's, the ALJ's and the Union's repeated references to Crowley subsidiaries other than CMS interchangeably with CMS, with no record evidence that CMS and other CMC subsidiaries operated other than independently of each other, fatally skewed its view of the record as a whole. For example, the IBU's February 13, 1998 letter

The per curiam opinion states that the Union "had reason to think" that the SIU arbitration award was relevant and that the Union "believed" it had been wronged. Maj. Op. at 1296. The Union's thoughts and beliefs, however, are irrelevant to whether the Union explained to CMS the relevance of the arbitration award at the time of its request. While I agree that "not much is required" to establish relevancy, *see Oil, Chem. & Atomic Workers,* 711 F.2d at 359, here there is simply *no* record support for the Board's conclusion that the IBU timely explained relevance as it was required to do.

The Board pointed to the IBU's February 13, 1998 letter as adequately alerting CMS to the relevance of the SIU arbitration award because the letter stated that the award would provide information about the contract under which the arbitration arose. Relying solely on the Board's spare discussion of that letter,[11] the per curiam opinion concludes that "[s]ubstantial evidence supports the Board's determination

that the Union communicated to Crowley that the arbitration award was reasonably relevant to pending and possible future grievance claims." The opinion glosses over the issue of timeliness; it ignores the fact that the February 13, 1998 letter was written almost three months after the Union made its request and four days after it filed an unfair labor practice charge. Even the Union's February explanation, however, failed to alert CMS to its "grievance," that is it was considering a claim under the work preservation clause.[12] Likewise, while the Union heard of the SIU arbitration award from someone at CMS, I fail to see how this fact made the substance of the award relevant. Finally, the Union's assertion that it had no notice of Tosco's decision not to renew the Barge 450–6 time charter is irrelevant to whether the Union disclosed its reasons establishing relevance. Thus, I fail to find anything approaching substantial evidence in the record showing that the Union met its

---

formally requesting the SIU arbitration award explained that "[i]t is important to determine whether the Company provided information to another Union that should have been provided to us." JA 173. But the "company" that was in a position to provide the SIU with information about the Tosco time charter of the Coast Range was CT&T or CPTI, not CMS. Neither CT&T nor CPTI is a party to this action. *See also supra* note 4. Likewise, the IBU's November 21, 1997 to CMS letter asked "what the Company intended to do with the tankers" even though the IBU had previously been informed that CMS did not operate or own any tankers. JA 170–71. And at oral argument the Board counsel questioned whether CPTI had the wherewithal to purchase Tosco's tankers, suggesting that the parent CMC was orchestrating some scheme to replace CMS barges with CPTI tankers at Tosco's Avon facility. This assertion lacks any record support.

11. The per curiam opinion grants the Board's cross-petition only to the extent that the Union's purported "grievance" rendered its information request relevant. It does not affirm the other Board theories of relevance.

12. Furthermore, I do not think the letter adequately set forth the work preservation theo-

ry. The February 13 letter states: "I would like to know what contract the grievance that led to arbitration was filed under, whether it was the tug and barge operation or the ship operation that claims were made under. It is important to determine whether the Company provided information to another Union that should have been provided to us. If so, under what circumstances was this information provided that led the Union to believe a contract violation occurred." JA 173. The Union did not explain why it wanted to know under what contract the SIU claims were made other than its suspicion that "the Company," *see supra* note 10, provided information to the SIU that it should have provided to the Union. In fact, the Union never explained that it wanted the information because it might pursue a work preservation claim. And even if there were similarities between the SIU contract and the IBU collective bargaining agreement with CMS (which the Union did not allege), I believe any similarity would support a work *claim* theory of relevance, not a work *preservation* theory because the IBU's collective bargaining agreement limits its representation to tankermen who work on barges, not the unlicensed individuals who work on tankers like the Coast Range. The Union did not and does not now base its request on a work claim theory.

burden to timely and affirmatively explain the relevance of its request.

Accordingly, I dissent.