NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

UNITED STATES POSTAL
SERVICE, Respondent.

No. 92–3741.

United States Court of Appeals,
Third Circuit.

Argued Aug. 4, 1993.

Decided March 14, 1994.

Jerry M. Hunter, Gen. Counsel, Yvonne T. Dixon, Acting Deputy Gen. Counsel, Nicholas E. Karatinos, Acting Associate Gen. Counsel, Aileen A. Armstrong, Deputy Associate Gen. Counsel, David A. Fleischer (argued), Sr. Atty., N.L.R.B., Washington, DC, for petitioner.

Anton G. Hajjar (argued), Lee W. Jackson, O'Donnell, Schwartz & Anderson, Washington, DC, Nancy B.G. Lassen, Willig, Williams & Davidson, Philadelphia, PA, for intervenors American Postal Workers Union, AFL–CIO.

R. Andrew German, Chief Counsel, Stephen E. Alpern (argued), Sr. Counsel, Appellate Div., U.S. Postal Service, Washington, DC, for respondent.

Before: STAPLETON, HUTCHINSON and ROTH, Circuit Judges.

## OPINION OF THE COURT

STAPLETON, Circuit Judge:

Before us is a petition from the National Labor Relations Board ("the Board") for enforcement of an order, 308 N.L.R.B. No. 189, 1992 WL 296020 (Sept. 30, 1992). The Board ruled that Respondent United States Postal Service had violated Subsections 8(a)(5) and (1) of the National Labor Relations Act ("the NLRA"), 29 U.S.C. § 158(a)(5) and (1), in two ways: first, by refusing to bargain with its employees' collective bargaining agent, Intervenor American Postal Workers Union, AFL–CIO ("APWU"), over the elimination of two new hiring procedures in the Postal Service's Philadelphia Division which the APWU alleged to be unlawfully discriminatory; and, second, by refusing to supply information about these hiring procedures to the APWU upon the APWU's request. The Board ordered the Postal Service to bargain with the APWU over the elimination of the procedures and to provide the APWU with a portion of the information it had requested.

We conclude that the APWU's basis for alleging that one of the Philadelphia Division's new hiring procedures was unlawfully discriminatory was insufficient to trigger an obligation on the part of the Postal Service to provide information or to bargain concerning that procedure. Regarding the other new hiring procedure, we find substantial evidence to support the Board's conclusion that the Postal Service committed unfair labor practices by refusing to bargain and by failing to supply relevant information at an appropriate time. Nevertheless, because the Board found, as a fact, that the second new hiring practice held no potential for unlawful discrimination, we decline to enforce its order to bargain over that practice in the absence of some explanation as to how the Board believes such bargaining would serve the purposes of the NLRA.

### I.

#### A.

The Postal Service is an independent establishment in the executive branch of the United States government with the authority to appoint its own employees. 39 U.S.C.

§§ 201, 1001(b). The APWU is the exclusive bargaining representative for all postal clerks, motor vehicle employees, special delivery messengers, and maintenance employees in the Postal Service. At all times relevant to this enforcement action, the APWU and the Postal Service were parties to a nationwide collective bargaining agreement ("the National Agreement"), which was effective from July 21, 1987, to November 20, 1990.[1] The National Agreement also covered city letter carriers, who were represented by the National Association of Letter Carriers, AFL–CIO.

In June of 1989, the Postal Service's Philadelphia Division Manager, Charles James, presented an "Affirmative Action Report" to the Postal Service's Board of Governors. The *Philadelphia Daily News* published an account of the report which stated that the Philadelphia post office was trying to increase the number of Hispanics, Asians, and white women in its work force. It stated that James had told the Board of Governors that affirmative action hiring had resulted in "an excellent representation" of black employees, but not of employees belonging to the other three groups. " 'Raising the awareness of good postal jobs among Hispanics and white females so that they will apply for our examinations' will be a major focus of the local postal service this year," the news report quoted James as saying. The news report continued:

The postal service will seek to get articles about postal employment into Hispanic newspapers and to place postal employment displays in shopping malls and child care centers, James said.

"We are exploring how we can obtain a mailing list of existing working women who make less than $15,000 yearly," he said, to inform them of Postal Service examinations.

\* \* \* \* \* \*

"The policy of the Postal Service," James explained, "is to hire a work force that is representative of the community in which it is located."

\* \* \* \* \* \*

James said he is concerned that there is no Hispanic female and a slight decrease in the number of black females in middle-management ranks. He said he plans to begin a "mentoring program" in Philadelphia ... to encourage minorities and women to move to higher assignments.

Rose DeWolf, *Post Office Hopes Hiring Plan Will Deliver*, Philadelphia Daily News, June 12, 1989, at 30.

After reading the newspaper article, Gregory Bell, the General President of the APWU's Philadelphia area local ("the Local"), wrote a letter to James, dated June 22, 1989, accusing him of "an attempt to cause racial tension within the work force, and between the work force and the public" by

---

1. Article 7 of the National Agreement states that employees "shall be hired pursuant to such procedures as the Employer may establish."
 Article 2 of the Agreement states:
 [T]he Employer and the Unions agree that there shall be no discrimination by the Employer or the Unions against employees because of race, color, creed, religion, national origin, sex, age, or marital status.
 Article 3 states:
 *The Employer shall have the exclusive right,* subject to the provisions of this Agreement and *consistent with applicable laws and regulations:*
 A. To direct employees of the Employer in the performance of official duties;
 B. *To hire, promote, transfer, assign, and retain employees* in positions within the Postal Service and to suspend, demote, discharge, or take other disciplinary action against such employees;
 C. To maintain the efficiency of the operations entrusted to it;
 D. To determine the methods, means, and personnel by which such operations are to be conducted;
 E. To prescribe a uniform dress to be worn by letter carriers and other designated employees; and
 F. To take whatever actions may be necessary to carry out its mission in emergency situations, i.e., an unforeseen circumstance or a combination of circumstances which calls for immediate action in a situation which is not expected to be of a recurring nature.
 (Emphasis added.)
 Article 5 states:
 The Employer will not take any actions affecting wages, hours and other terms and conditions of employment as defined in Section 8(d) of the National Labor Relations Act which violate the terms of this Agreement or are otherwise inconsistent with its obligations under law.

implying that too many black postal employees worked in the Philadelphia Division. Bell requested information about the statistics and Postal Service plans reported in the newspaper article and demographic information about the Philadelphia Division's employees. Bell sent copies of his letter to ten members of Congress, the two United States Senators from Pennsylvania, and four postal officials, including the Postmaster General.

In a letter dated July 18, 1989, D.J. Bugey, the Human Resources Director of the Philadelphia Division, responded to Bell's June 22 letter. Bugey stated that the *Daily News* had quoted James accurately "with respect to Postal Service Affirmative Action planning." Bugey continued: "It is our policy to hire a workforce that is representative of the community in which our installations are located. In pursuit of that objective, we review and compare our workforce profile with that of the Civilian Labor Force provided from Postal Service Headquarters each year." Bugey provided Bell with data from the Department of Labor on the Philadelphia area labor force based on the 1980 census as well as more recent data from the Commonwealth of Pennsylvania. Bugey also sent Bell a demographic analysis of postal employees in the Philadelphia Division. The data showed a smaller percentage of Hispanics and non-minority women in the Philadelphia area's postal work force than in its general work force.

On August 21, 1989, James, Bell, and other APWU representatives attended a meeting with Pennsylvania Senator Arlen Specter. After the meeting, James issued a press release and sent a letter to postal employees in Philadelphia to clarify his prior comments to the press and to the Board of Governors. James included copies of his press release and his presentation to the Board of Governors with his letter to postal employees. In the letter and press release, James stated that the Postal Service was not "attempting to reduce the number of minority employees in the Division," but was "simply trying to make underrepresented groups aware of postal employment opportunities so that they take the postal employment test." He stated that presentations to the Board of Governors on affirmative action programs were expected of local managers by the Board. He also stated that the Equal Employment Opportunity Commission requires a yearly report showing any work force underrepresentation and plans to correct it.

The APWU expressed no further dissatisfaction with the Postal Service's hiring policies until approximately five months later, in January of 1990, when the Philadelphia Division implemented the two new hiring practices which are at issue. The first new practice was the mailing of solicitations to women living in the Philadelphia city and in the Philadelphia suburbs encouraging them to apply for clerk and carrier positions at the Philadelphia Division. For this purpose, the Philadelphia Division purchased two mailing lists. From Donnelly Marketing, an Illinois marketing firm, the Philadelphia Division purchased a list of 42,702 working women residing in the "191" and "190" zip codes earning $15,000 or less annually. Philadelphia city zip codes begin with the numerals 191; Philadelphia suburban zip codes begin with the numerals 190. From the American Student List Co., a New York firm, the Philadelphia Division purchased a list of 5,222 women residing in the 191 and 190 zip codes who were graduated from high school in 1989. The Human Resources staff of the Philadelphia Division sent solicitations to every woman on the mailing lists. Lacking an automated mailing system, the Human Resources staff placed the 47,924 solicitations in envelopes and sealed and labeled the envelopes manually. The Human Resources staff performed this task over the course of several weeks beginning in January, 1990, and finishing in February, 1990. All the solicitations mailed were identical except the Human Resources Staff changed the date on the cover letters several times so that the targeted women would not receive correspondence which appeared to be outdated.

The Philadelphia Division's second new hiring practice was the use of a computerized system, dubbed OPTEX,[2] for randomly se-

---

2. OPTEX is an acronym for "Open Testing Experiment" or "Optional Program for Examina- tions."

lecting applicants to take the examination which establishes eligibility for employment with the Postal Service. OPTEX was part of an effort by the Postal Service to streamline its recruitment efforts. Traditionally, all applicants for postal positions with the Philadelphia Division had been tested, and all applicants who achieved satisfactory examination scores had been placed on an employment waiting list. OPTEX departed from past practices by randomly selecting applicants to take the test and by testing the selected applicants only as needed, thereby reducing the waiting list of eligible applicants. The objectives of OPTEX were to reduce testing costs and to minimize unwarranted optimism among applicants about their chances of being hired. The Postal Service began to experiment with OPTEX in 1986, trying it at 23 major postal installations. By 1989 the Postal Service had granted the postmasters at the 50 largest post offices (including Philadelphia) the discretion to try OPTEX.

About the time Bell learned of the implementation of OPTEX by the Philadelphia Division, Bell learned that a number of people residing in urban Philadelphia told the Local that they knew people residing in the Philadelphia suburbs who had received notices inviting them to apply for jobs with the Philadelphia Division. The people living in urban Philadelphia complained to the Local that they had not received invitations themselves. Bell did not provide to the Postal Service or to the administrative law judge at the unfair labor practice hearing information regarding the size or demographic composition of the group of complaining urban residents or of the group of suburban invitees they had mentioned.

■ Upon receiving these complaints, Bell sent James a series of letters, dated February 1, 27, 28 and March 19, 1990, in which he accused James of having adopted the new hiring practices in an attempt to reduce the postal employment opportunities of blacks and other minority groups. Bell demanded that the new hiring practices be rescinded and that the Postal Service supply him with extensive information regarding their implementation and operation. On February 7 and 9, Bell sent similar letters to Senator Specter, the President and Vice President of the APWU, and other Postal Service officials. On February 9, Bell filed a grievance under the Grievance Arbitration Procedure of Article 15 of the National Agreement, and, on February 23 and March 20, Bell filed with the NLRB the unfair labor practice charges which are the subject of this appeal. In letters dated March 9, April 24, and October 2, 1990, the APWU informed the Postal Service that it adopted as its own Bell's information and bargaining requests and also the unfair labor practice charges Bell had filed on behalf of the Local. The Board regarded the APWU's October 2, 1990, letter as the APWU's demand for bargaining over elimination of the new hiring practices.[3]

Taken together, Bell's letters to James set forth his theory of how the new procedures might discriminate against minorities. Two elements of Bell's theory are relevant to the instant Board enforcement application. First, Bell expressed the belief that residents of the Philadelphia suburbs were receiving preferential notification of job opportunities with the Philadelphia post office at the expense of the Philadelphia urban community where more minorities reside. Second, concerning OPTEX, Bell insisted that postal regulations enabled any applicant on the eligibility roster for one postal facility to transfer to an eligibility roster at another postal facility. That being the case, Bell continued, applicants for employment at suburban facilities, who were not subject to random selection (because OPTEX was not used in the suburbs), could establish their eligibility in the suburbs and later transfer to the Philadelphia roster, leap-frogging the many, largely minority, applicants who would apply in Philadelphia but would be screened from taking the eligibility examination by OPTEX.

**3.** Applying the "substantial evidence" review standard of *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 464–65, 95 L.Ed. 456 (1951), we reject the Postal Service's conten-tion that the Board erred in finding that the APWU actually had demanded bargaining and requested information in its own right.

In responses to Bell and to the APWU, the Postal Service refused to rescind its new hiring practices or to supply much of the requested information. It did offer general explanations of its hiring goals and procedures, and assurances that it was implementing its new procedures fairly. On the subject of the solicitation of potential job applicants, John Marshall, Human Resources Director at the Philadelphia Division, wrote Bell a letter dated February 6, 1990, which stated:

> Regarding your concern of preferential notices of employment opportunities to suburban residents, the Human Resources Department is taking measures to ensure all individuals are equally notified of the announcement.... Regarding the solicitation of applicants by mail, addresses were obtained from Donnelly Marketing & Research and American Student List Co. These names represent individuals residing in the Philadelphia area as well as areas within the Philadelphia commuting distance.

A March 27, 1990 letter to Bell from William Donnelly, Jr., the Human Resources Director of the Postal Service's Eastern Regional Office, added slightly more detail, describing the exact contents of the mailing lists the Philadelphia Division had purchased.

On the subject of OPTEX, Marshall's February 6 letter stated:

> Regarding your concerns that OPTEX will discriminate against and undercut Blacks and other minorities and deprive Philadelphia Area applicants opportunities for employment, all applicants who complete an application will have their names entered into the computerized system prior to selection from a pool. The number needed for testing is entered, and random selection of the applicants takes place.

Donnelly's March 27 letter added:

> To ensure the integrity of the random selection process and the public's perception of fairness, the OPTEX system was designed to function off site and is managed by the Headquarters' Office of Selection and Evaluation. The host computer is located at the Minneapolis Postal Data Center. The randomization process is accomplished at the Minneapolis Postal Data Center.

The Postal Service's responses did not specifically address Bell's concern about applicants transferring onto the Philadelphia Division's eligibility roster from the non-OPTEX rosters of suburban postal facilities. It was not until the initial proceeding before the NLRB administrative law judge that the Postal Service specifically informed the APWU that transfers onto the Philadelphia Division's OPTEX roster were not permitted.

**B.**

The Board's decision that the Postal Service's responses to the APWU's bargaining and information requests had violated the National Labor Relations Act was an extension of its prior opinion in *Star Tribune v. Newspaper Guild of the Twin Cities*, 295 N.L.R.B. 543 (1989). *Star Tribune* itself relied on the Supreme Court's construction of the NLRA in *Allied Chemical & Alkali Workers of America v. Pittsburgh Plate Glass Co.*, 404 U.S. 157, 92 S.Ct. 383, 30 L.Ed.2d 341 (1971).

Subsections 8(a)(5) and (d) of the NLRA impose a duty on employers to bargain with their employees' representatives regarding the employees' "wages, hours, and other terms and conditions of employment." In *Allied Chemical*, the Supreme Court held that only matters which concern current employees' terms and conditions of employment, or matters which "vitally affect" those terms and conditions, are mandatory subjects of bargaining. *Allied Chemical* reversed an NLRB decision that an employer's unilateral alteration of retired employees' pension benefits violated the NLRA. The NLRB's decision had been based on the theory that retired employees are "employees" within the meaning of the Act. The Court noted that the legislative history of the NLRA indicates that the term "employee" is not to be stretched beyond its plain meaning embracing only those who work for another for hire. The Court concluded that the ordinary meaning of "employee" does not include a retired worker because a retired worker has ceased to work for another for hire. The Court also rejected the notion that retiree pension bene-

fits "vitally affect" the terms and conditions of current employees' employment. The Court stated that more than speculative or insubstantial effects must be shown for a matter involving individuals outside the employment relationship to be a mandatory subject of bargaining.

In *Star Tribune*, the Board was called upon to apply *Allied Chemical* in the context of hiring practice. The employer in *Star Tribune* had unilaterally implemented a policy of testing both current employees and job applicants for drug use. The union requested information regarding the employer's drug testing of applicants, and the employer refused to supply the information. The Board held that under *Allied Chemical,* prospective employees were not "employees" within the meaning of the NLRA's collective bargaining obligations. The Board also rejected the notion that an employer's decision to test job applicants for drug use "vitally affected" the terms and conditions of current employees' employment. Therefore, the Board held, preemployment drug testing, in and of itself, is not a mandatory subject of bargaining under the statutory duty to bargain about employees' terms and conditions of employment.

The Board did not end its inquiry there, however, because the union alleged that the employer's drug-testing procedures were sexually discriminatory, and record evidence existed that the employer administered drug testing differently for men and women, 295 N.L.R.B. 543, 548 n. 17. The Board indicated that it believed discrimination in hiring on the basis of sex *"inter alia"* [4] vitally affects the terms and conditions of active employees' employment. Therefore, the Board held, an employer must provide the union with information the union requests concerning hiring practices the union suspects are sexually discriminatory.

In the instant case, the Board applied *Star Tribune* to the Postal Service's implementation of the new hiring practices in its Philadelphia Division. The Board first held that an employer who unilaterally implements facially nondiscriminatory hiring practices should not be found to have committed an unfair labor practice just because the employer did not anticipate that its employees' representative will later view those practices as discriminatory.[5] Therefore, the Philadelphia Division had not committed an unfair labor practice by unilaterally implementing its mail solicitation campaign and OPTEX.

The Board next held that the Postal Service had a duty to bargain with the APWU concerning the *elimination* of the allegedly discriminatory hiring procedures once they were implemented:

> In our view, the policies of the [National Labor Relations] Act will be adequately served by allowing employers to choose their hiring practices subject to a bargaining obligation if the union demands bargaining over aspects of the practices that the union has an objective basis for believing may discriminate against protected groups, or otherwise vitally affect unit employees' terms and conditions of employment.

1992 WL 296020 at *5. The Board found that the APWU adduced "sufficient evidence" in support of its allegations of discrimination to trigger an obligation on the part of the Postal Service to bargain over its new hiring practices. Therefore, the Board held, the Postal Service's refusals to bargain over its new hiring practices were unlawful.

Finally, the Board turned to the Postal Service's refusal to provide all of the infor-

---

**4.** 295 N.L.R.B. 543, 549. *See also United States Postal Service,* 1992 WL 296020 at *6 (*Star Tribune* rule applies to "discrimination in hiring on the basis of personal characteristics such as sex"). We presume the other bases of discrimination to which the Board has alluded are those enumerated in Title VII of the Civil Rights Act of 1964, 78 Stat. 253, as amended, 42 U.S.C. § 2000e *et. seq.* That statute makes it an unfair employment practice for an employer to discriminate against any individual with respect to hir-

ing or the terms and conditions of employment because of such individual's race, color, religion, sex, or national origin. *See also Wards Cove Packing Co. v. Antonio,* 490 U.S. 642, 645, 109 S.Ct. 2115, 2118–19, 104 L.Ed.2d 733 (1989).

**5.** The Board stated that it was not addressing the question of an employer who unilaterally implements facially discriminatory hiring practices. 1992 WL 296020 at *5 n. 16.

mation sought by the APWU. Because the Postal Service had a duty to bargain over the elimination of the two hiring practices, it was found to have a derivative duty to provide requested information "relevant and necessary to the [APWU's] performance of its function as the unit's employees' bargaining representative." 1992 WL 296020 at *10. Employing "a liberal, discovery-type standard," the Board ordered broad disclosure. Significantly, however, the Board declined to order a response to the information requested in items 8, 9, 21 through 24, 26 and 27. Items 8 and 9 were denied on the following ground:

> [W]e agree with the Respondent that it promptly explained that selection for testing under OPTEX is completely random, and the applicants are not categorized in any way before selection begins.

1992 WL 296020 at *14. The remaining items were denied on the following ground:

> Items 21 through 24, 26 and 27 deal with the application process and hiring at the suburban post offices. That information was relevant to the Unions' fear that whites from the suburbs would be allowed to transfer to the Philadelphia eligibility register, bypassing nonwhites who were screened out under OPTEX, and it therefore should have furnished. *However, in light of [the] credited testimony [of the Postal Service's director of selection and evaluation in its national employee relations department] that transfers to OPTEX registers are not, in fact, allowed, we agree with the judge that the information sought in these respects would no longer be of assistance to the Unions, and need not be provided now.*

*Id.* at *15 (emphasis added).

### C.

The Board had jurisdiction to consider the APWU's unfair labor practices complaint pursuant to the Postal Reorganization Act, 39 U.S.C. § 1209(a), which governs the Postal Service's employee-management relations. We have original jurisdiction over an application by the NLRB to enforce a final order of the NLRB covering labor practices which occur within the Third Circuit. NLRA § 10(e), 29 U.S.C. § 160(e).

### II.

### A.

■ We begin our analysis by considering whether the Board properly concluded that a hiring practice is a mandatory subject of collective bargaining where there is an objective basis for believing that the practice discriminates on the basis of race or sex. The Board's conclusion rests ultimately on its interpretation of how far the statute requiring employers to bargain over terms and conditions of employment extends. We therefore are bound to uphold the Board's decision so long as it is "rational and consistent" with the NLRA and relevant Supreme Court precedent. *See Litton Financial Printing v. NLRB*, 501 U.S. 190, ——, 111 S.Ct. 2215, 2222, 115 L.Ed.2d 177 (1991).

■ The Board correctly noted that under *Allied Chemical* an employer generally has no duty to bargain over practices that involve non-unit employees, but that an employer does have a duty to bargain over unit employees' terms and conditions of employment and any other matter that "vitally affects" those terms and conditions. The Board then reasoned that an employment practice that discriminates on the basis of race or sex cannot help but "vitally affect" the terms and conditions of employment for active employees because the two matters are "intertwined." 1992 WL 296020 at *6.

The Board did not explain this interrelationship further because it did not understand the Postal Service to dispute that a duty to bargain over a hiring practice arises when an objective basis exists for believing that the practice invidiously discriminates. The Board's brief, however, explains that a discriminatory hiring practice can be expected to: (a) communicate to unit employees a message about the attitude of management that will, *inter alia*, discourage minority unit employees from applying for promotion or even from continuing to work for the employer, and (b) interfere with the right of minority and non-minority unit employees to a discrimination-free work environment in which

minority unit employees do not feel isolated and non-minority unit employees have the benefits of association with a representative work force.

■ The Postal Service does not dispute that there are cases in which the inferences drawn by the Board would be appropriate. Rather, it insists that this record is devoid of any evidence of a discriminatory "message" being sent by the Postal Service or of current employees feeling isolated or deprived of a heterogeneous work force. The effects of which the Board speaks are long term effects, however, and it is unrealistic to suppose that a union confronted with a discriminatory hiring practice will be able to point to specific evidence of an immediate impact on active employees. We, like the Board, therefore decline to require such a showing as a prerequisite to a duty to bargain over the elimination of such a practice.

■ The absence of immediate effects on active employees does not require the Board to ignore what it has learned about the effects of discriminatory hiring practices in the workplace. The link between discrimination in hiring and a discriminatory environment in the workplace is a direct one, and the Board has drawn reasonable inferences concerning the potential impact of discriminatory hiring practices on working conditions. Also, *Allied Chemical* can rationally be distinguished on the ground that invidious discrimination against job applicants affects the demographic composition of the bargaining unit in a manner that reduction of retirees' pensions does not. Accordingly, we decline to hold that the Board erred in concluding that a hiring practice is a mandatory subject of collective bargaining where there is an objective basis for believing it to be discriminatory. *Cf. Gray v. Greyhound Lines, East,* 545 F.2d 169, 173–76 (D.C.Cir.1976) (employees have Title VII standing to challenge allegedly discriminatory hiring practices which allegedly cause employees psychological injury).

### B.

■ The Postal Service contends that the APWU negotiated over and contracted away any right to bargain over new hiring practices which it might reasonably believe to be discriminatory. If the Postal Service is correct, we need not address the substance of the APWU's complaints about the new hiring practices. We must look then to the National Agreement—the collective bargaining contract between the APWU and the Postal Service. To support its waiver argument, the Postal Service points to Article 7 of the National Agreement which states that "employees ... shall be hired pursuant to such procedures as the Employer may establish."

The Board rejected the Postal Service's waiver argument, citing Article 3 of the Agreement which reflects an intent that the powers reserved to the Postal Service, including the power to hire as it saw fit, would be exercised in a manner consistent with applicable laws, "presumably including those directed at the eradication of discriminatory employment practices." 1992 WL 296020 at *7. Similarly, the Board cited Article 5 of the Agreement which precludes the Postal Service from taking any action affecting wages, hours, and conditions of employment that is "inconsistent with its obligations under law."

We conclude that Articles 3 and 5 support the Board's rejection of the waiver argument. We think it even more important to note that in Article 2 the parties committed themselves to eradicating all "discrimination by the Employer or the union against employees because of race, color, creed, religion, national origin, sex, age or marital status." The issue here, as we see it, is whether in the context of this commitment, Article 7 should be read as a waiver of the union's right to bargain collectively over a hiring practice which there is a reasonable basis to believe will ultimately have a discriminatory effect in the workplace and result in a substantial adverse effect on active employees. We agree with the Board that the National Agreement, read as a whole, bears no clear evidence of an intent on the part of the APWU to surrender its statutory bargaining rights in such circumstances. *See Ciba–Geigy Pharmaceuticals Div. v. NLRB,* 722 F.2d 1120, 1127 (3d Cir.1983) ("waiver of a union's statutory collective bar-

gaining rights must be clear and unmistakable").

### C.

In the foregoing discussion concerning waiver and the effects of discriminatory hiring practices, we have assumed a situation in which there is a rational basis for a belief that the facially nondiscriminatory hiring practices instituted by the employer in fact discriminate. The Postal Service denies that this is such a situation. Before turning to that aspect of its argument, however, we review the controlling legal principles that must inform our decision.

The Board cast the crucial issue in terms of whether the APWU had "an objective basis" for believing that the challenged hiring practices discriminate. 1992 WL 296020 at *5. " '[M]ere allegations' or 'bare suspicions' of discrimination[, the Board observed, do] not create an obligation to bargain." *Id.* at *9 n. 29 and accompanying text. The crucial finding of the Board was that "the Unions adduced sufficient evidence in support of their allegations of discrimination to trigger an obligation to bargain." *Id.* at *6. As the dissenting Board member notes, without a threshold requirement that the unit bargaining representative has evidence tending to show that a facially nondiscriminatory hiring practice operates in a discriminatory manner, the Board's *Star Tribune* doctrine would "swallow" the *Allied Chemical* rule that an employer's practices with respect to non-unit members are not subjects for mandatory bargaining unless they are shown to "vitally affect" unit members. *Id.* at *17 (Member Oviatt, dissenting).

In order to determine whether the APWU "adduced sufficient evidence ... to trigger an obligation to bargain," we must first ascertain what is meant by "adduced" and identify the point or points in time at which the union's evidence is to be evaluated. This is important because the Board's *Star Tribune* doctrine can function satisfactorily in the workplace only if the parties are able to identify in practice whether and when a duty to bargain or provide information regarding a hiring practice has arisen.

■■■ The Board, for example, properly rejected the notion that the Postal Service violated the NLRA by instituting new, facially nondiscriminatory hiring practices without first giving notice and an opportunity to bargain, even assuming the hiring practices later appeared to be discriminatory. The Board's rejection of this notion was based on the Board's recognition that an employer has to be able to determine when it is confronted with a situation which is an exception to the general rule that it does not have to bargain over hiring practices. Two propositions are inherent in this recognition: first, the union's evidence is "adduced" only when it is communicated to the employer; and, second, the relevant evidence is that which has been communicated to the employer as of the time of the refusal to bargain which gives rise to the unfair labor practice charge. Stated otherwise, the duty to bargain over hiring practices arises only when the union has made a demand and has communicated information to the employer indicating that it has an objective basis for alleging discrimination. Only after the employer has had an opportunity to consider the union's demand and any evidence of discrimination tendered in support of its demand, and then rejects the union's demand, can the employer violate its duty to bargain. The Board correctly so held when it found that the Postal Service's unilateral institution of the new hiring practices did not constitute an unfair labor practice.

Turning from the duty to bargain to the duty to provide information, we note that a separate analysis is required with respect to each duty. While the duty to provide information in this context derives from the duty to bargain, this does not mean that the union may not be entitled to information relevant to the issue of discrimination before it has established its right to insist on bargaining over the hiring practice.

■■■ It is, of course, well established that an employer must provide a union with requested information if it will be of use to the union in fulfilling its statutory duties and responsibilities as the employees' exclusive bargaining representative. Information about the terms and conditions of employ-

ment of employees actually represented by a union is presumptively necessary and is required to be produced. When the information requested concerns persons not represented by the union, however, there is no such presumption and the union has the burden of establishing that the information is necessary to the performance of its representational responsibilities. *Walter N. Yoder & Sons, Inc. v. NLRB*, 754 F.2d 531 (4th Cir. 1985); *NLRB v. Ohio Power Co.*, 531 F.2d 1381 (6th Cir.1976). Since the union may have a duty to demand bargaining over the elimination of a hiring practice if it is discriminatory, we believe a union satisfies this burden with respect to information relevant to the issue of discrimination whenever it has a rational basis for believing that the practice *may* discriminate, i.e. information sufficiently probative of discrimination to support a belief that further inquiry is justified. *Cf. Yoder, supra.* Thus, a union may be entitled to information before it has made a bargaining demand. So, too, where the information received by the union in response to its request indicates an absence of discrimination, the fact that an employer had a duty to provide information does not necessarily mean that it will have a duty to bargain on subsequent demand.

In addition to the fact that the information available to the union at the time of a request for information will normally be different from the information available to it at the time of a subsequent bargaining demand, the applicable legal standard may be different as well. While a union is entitled to information whenever it has a factual basis for a belief that the hiring practice *may* discriminate, *Allied Chemical* may indicate that elimina-

tion of the practice does not become a mandatory subject of bargaining unless and until there is a factual basis for a belief that it *does* discriminate, i.e. there is information from which a rational decision-maker could conclude that discrimination is present. The threshold for investigation may thus be lower than the threshold for bargaining. It is unnecessary for us to so hold in this case, however. As we will see, the lesser threshold was never achieved by the APWU in connection with the mail solicitation campaign, and the higher threshold was satisfied at all times during the parties' communications regarding OPTEX.

### III.

 Regarding solicitation of job applicants for openings at the Philadelphia Division, the Board concluded that Bell "could ... have entertained a reasonable belief, based on all the facts in his possession, that [the mail solicitation campaign] would operate in a discriminatory manner." 1992 WL 296020 at *10. The Board so concluded because Bell "alleged, on the basis of information he had received, that the [Postal Service] was actively recruiting applicants from the Philadelphia suburbs but not from the central city," and that the suburbs are "overwhelmingly white, while the central city is 40 percent nonwhite." Id. at *9. The Board pointed out that the labor force data provided a factual basis for the latter part of this allegation. It did not, however, further describe the information Bell received that supported a reasonable belief that the Postal Service notification program would, or even might, operate in a discriminatory manner.[6]

---

6. In a footnote, the Board did point out that "James had said in mid–1989 that the Respondent would not, and could not, change its hiring practices, and then proceeded to do just that." 1992 WL 296020 at *10 n. 34. (The Board's reference is to the press release James issued following his August 21, 1989 meeting with Senator Specter and Postal Service and APWU representatives.) "In these circumstances," the Board stated, "it is understandable that the unions did not abandon their concerns solely on the basis of generalized assurances that the new hiring practices were non-discriminatory." *Id.*

The Board's point appears to be that James had given the union reason to suspect that assur-

ances from Postal Service representatives were unreliable. Even assuming, however, that the unions were justified in thinking that they could not rely on assurances by the Postal Service that the mail solicitation campaign was *not* discriminatory, this did not relieve them of the burden of communicating to the Postal Service a sufficient positive factual case for asserting that the campaign *was* discriminatory. Moreover, we believe the Board's underlying implication that James had made an inaccurate prediction about the Philadelphia Division's future hiring policies—or worse, lied—is not supported by substantial evidence. James' statement, in context, reads:

IT IS FEDERAL GOVERNMENT, AS WELL AS POSTAL POLICY TO EVALUATE HOW

The Postal Service insists that the record reveals no rational basis for such a belief. We agree.

 Bell testified at the unfair labor practice hearing that an unspecified number of unidentified city residents had reported to the Local that they had not been solicited by the Postal Service but understood that other unidentified suburban residents had been solicited. This was all of the information he was able to provide as a basis for a belief that the Postal Service "was actively recruiting applicants from the Philadelphia suburbs but not from the central city." [7] While Bell's information may have provided a rational basis for believing the Postal Service was notifying individuals in the suburbs, without more information concerning the number and identity of those reporting to the Local, it clearly provides no factual basis for suspecting discrimination against city residents.

> WELL WE ARE DOING IN HIRING A WORKFORCE THAT SOMEWHAT MIRRORS THE CIVILIAN LABOR WORKFORCE OF THE METROPOLITAN AREA IN WHICH WE SERVE. THE STATISTICS ARE OBTAINED FROM THE BUREAU OF CENSUS, AND INCLUDE AN EIGHT COUNTY AREA IN THE PHILADELPHIA AREA. IN FACT, WE FILE A YEARLY REPORT WITH THE EQUAL EMPLOYMENT OPPORTUNITY COMMISSION SHOWING ANY UNDER-REPRESENTED GROUPS AND OUR PLANS TO CORRECT THAT UNDER-REPRESENTATION. *WE HAVE NOT CHANGED ANY HIRING POLICIES LOCALLY—NOR CAN WE.* YOU MUST CONTINUE TO TAKE THE APPROPRIATE TEST FOR CAREER POSITIONS, AND BE CONSIDERED ON THE BASIS OF YOUR SCORE, WITH PERSONS MAKING THE HIGHEST SCORE CONSIDERED FIRST. WHAT WE PLAN TO DO IS TO TRY TO MAKE THE UNDER-REPRESENTED GROUPS MORE AWARE OF THE OPPORTUNITIES OFFERED BY THE POSTAL SERVICE SO THEY WOULD BE ENCOURAGED TO TAKE OUR FUTURE EXAMINATIONS. WE ARE CURRENTLY UNDER-REPRESENTED IN HISPANICS, BOTH MALE AND FEMALE, AND WHITE FEMALES. WE SIMPLY WANT TO DO A BETTER JOB OF MAKING THESE GROUPS AWARE OF THE CAREER OPPORTUNITIES IN THE POSTAL SERVICE. I NEVER SAID THAT ANY GROUP WAS OVER REPRESENTED. [sic] THAT WAS A CONCLUSION DRAWN BY THE LOCAL AMERICAN POSTAL WORKERS UNION PRESIDENT.

After Bell's initial demand for information from the Postal Service, all of the additional information he received supported the proposition that the mail solicitation campaign did not operate in a discriminatory manner. In response to his communication to the Postal Service of his concern about preferential solicitation of suburban residents, the Postal Service advised Bell "regarding the solicitation of applicants by mail" that "addresses were obtained" for "individuals residing in the Philadelphia area as well as areas within the Philadelphia commuting distance." The Postal Service also informed Bell that the addresses came from lists of working women earning less than $15,000 per year, and women who had been graduated from high school in 1989, who resided in the urban and suburban Philadelphia zip code areas. The Postal Service also told Bell that the lists contained over 47,000 names. While these assurances may not have been as artfully worded as hindsight would counsel, their clear implica-

(Emphasis added.) James' press release was in response to the initial controversy sparked by the June 1990 newspaper account of his "Affirmative Action Report" to the Board of Governors. When he stated in the press release that hiring policies had not been changed and could not be changed locally, he was referring to the Philadelphia Division's policy of seeking to attract applicants from underrepresented groups and its policy of applying identical testing and hiring criteria to all applicants for positions with the Philadelphia Division. Nothing about the Philadelphia Division's implementation of its mail solicitation campaign and OPTEX five months later contradicts James' statements in his press release.

7. We have not been able to find in the record, and the Board does not appear to cite in its brief, evidence that anyone told the Postal Service prior to the unfair labor practice hearing about the complaints the Local had received. We will assume for the purposes of this opinion that Bell informed the Postal Service about the complaints before the Postal Service rejected the APWU's bargaining and information requests. Of course, if the Postal Service was not informed of the complaints prior to its rejection of the APWU's requests, the Board erred by taking the complaints into account in considering whether the Postal Service's rejection was unlawful. As we explained above, only after an employer has had an opportunity to consider the basis for a union's information or bargaining demand can the employer violate the NLRA by rejecting the demand.

tion was that the Postal Service was sending solicitations to all of the women on the lists. In addition, the narrow demographic profile represented by the lists provided plausible, benign explanations for the reports which Bell testified gave rise to his suspicion that racially discriminatory notification was occurring. Bell did not claim that, and apparently did not know whether, any of the urban Philadelphia residents who complained to the Local were women who had been graduated from high school in 1989 or were working women who earned less than $15,000 per year.

Since Bell at the time of his initial complaint about the mail solicitation campaign had no factual basis for a belief that it may have been operating in a discriminatory manner, and since all of the information he thereafter obtained supported the contrary thesis, Bell was unable to "adduce" information for the Postal Service from which it could have determined that the Service had either a duty to bargain over the cessation of the campaign or to supply information relevant to it. Accordingly, we will decline to enforce any order based upon the Board's conclusion that the Postal Service committed an unfair labor practice in connection with its mail solicitations.

### IV.

 Regarding the new OPTEX procedures, Bell informed the Postal Service that, according to his understanding of postal regulations, job applicants would be able to transfer from suburban employment rosters to the Philadelphia roster, thereby leap-frogging Philadelphia applicants who had been screened from the Philadelphia roster under OPTEX. Citing the disparity in the racial composition of the urban and suburban Philadelphia populations, Bell expressed to the Postal Service his fear that OPTEX would have a racially discriminatory effect on the composition of the urban Philadelphia postal work force. Given the information available to Bell, we think his fear had a reasonable basis in fact. As we have noted, the labor force data supported Bell's demographics

and there is no dispute that the general practice of the Postal Service was to permit transfers. Because Bell communicated an objectively plausible concern and its basis to the Postal Service, the Postal Service could not lawfully reject his requests for information relevant to determining whether OPTEX would discriminate in this manner.

 We also agree with the Board that at the time the Postal Service rejected the bargaining demand of October 2, 1990, the APWU had adduced information sufficient to permit a reasonable belief that OPTEX would operate in a discriminatory manner. While the Postal Service later explained at the unfair labor practice hearing that it did not follow its usual transfer procedures under OPTEX and would not allow transfers onto the Philadelphia roster, the Board properly concluded that this was irrelevant to the issue of whether the Postal Service committed an unfair labor practice in refusing the demand to bargain. Clearly, the process contemplated in *Star Tribune* will not work if employers are free to refuse bargaining demands on the basis of undisclosed information. As the Board recognized, an employer's subsequent demonstration that a hiring practice does not discriminate may bear on the issue of remedy. It is not, however, a defense to an unfair labor practice charge based on the refusal to bargain.

### V.

Having found substantial evidence to support the Board's holding concerning the unfair labor practice charges insofar as they relate to OPTEX, we finally turn to the propriety of its remedial order. The Board's order directs the Postal Service (1) "on request, [to] bargain with the Union over the elimination of actual or suspected discriminatory hiring practices" and (2) to "the extent it has not already done so, [to] furnish the union with all relevant ... information requested in its letters" and found by the Board to be relevant.[8] We do not understand the mail solicitation campaign and OP-

---

8. The Board's order also directs the Postal Service to post a notice of its unfair labor practices and to cease and desist from similar practices in the future.

TEX to be connected in any relevant way and the Board did not suggest otherwise. As a result, we find no basis on which we could enforce the Board's order insofar as it requires bargaining over the mail solicitation campaign and the providing of information with respect thereto.

■ To the extent that the Board's order directs the Postal Service to supply some of the information requested by APWU regarding OPTEX and to bargain over the elimination of OPTEX, we have a different concern. At the same time the Board entered its order, it denied the APWU information it had requested based on the fact that the Postal Service had demonstrated to the satisfaction of the Board (1) that "selection for testing under OPTEX is completely random" and (2) that "transfers to OPTEX registers are not, in fact, allowed." 1992 WL 296020 at *14, *15. Thus, the Board ordered bargaining and the production of information when it was apparently satisfied that OPTEX does not discriminate in the only way the union has ever plausibly suggested it might.

The Board " 'has broad discretion to adapt its remedies to the needs of particular situations' in order to effectuate the policies of the Act." *Brockway Motor Trucks v. NLRB,* 582 F.2d 720, 740 (3d Cir.1978) (quoting from *Local 60, United Brotherhood of Carpenters v. NLRB,* 365 U.S. 651, 655, 81 S.Ct. 875, 877, 6 L.Ed.2d 1 (1961)). Accordingly, we are not prepared to hold that the Board, having found the unfair labor practices it did in connection with OPTEX, could not lawfully order bargaining, and the production of information, concerning it. Nevertheless, given the fact that OPTEX appears not to vitally affect the working conditions of members of the unit and given the absence of any Board finding that the Postal Service's failure to inform the APWU that transfers onto OPTEX registers were not allowed resulted from anything other than inadvertence, we would be reluctant to enforce such an order in the absence of an explanation of how the Board believes enforcement would further the purposes of the Act. Finding no such explanation in the Board's decision and no consideration of the efficacy of lesser, alter-

native sanctions, we decline to enforce the Board's order even as it relates to OPTEX.

If the Board believes that it would serve the purposes of the Act in the context of this case to order bargaining and the production of information concerning OPTEX, we invite it to articulate its rationale for that belief, enter a new order limited in scope to OPTEX, and petition for the order's enforcement. Alternatively, if the Board concludes that the purposes of the Act would be served by enforcement only of that portion of its order that requires the Postal Service to post a notice of its unfair labor practices and cease and desist from similar practices in the future, it may renew its petition and that portion of its order will be enforced.

### VI.

The petition to enforce the Board's order in its present form will be denied.