# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued April 4, 2016            Decided May 20, 2016

No. 15-1081

IRONTIGER LOGISTICS, INC.,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

———

Consolidated with 15-1148

———

On Petition for Review and Cross-Application
for Enforcement of an Order of
the National Labor Relations Board

———

*Thomas P. Krukowski* argued the cause and filed the briefs for petitioner.

*Ruth E. Burdick*, Deputy Assistant General Counsel, National Labor Relations Board, argued the cause for respondent. On the brief were *Richard F. Griffin*, *Jr.*, General Counsel, *John H. Ferguson*, Associate General Counsel, *Linda Dreeben*, Deputy Associate General Counsel, *Robert J.*

*Englehart*, Supervisory Attorney, and *Marni L. von Wilpert*, Attorney.

Before: TATEL and MILLETT, *Circuit Judges*, and SILBERMAN, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* SILBERMAN.

SILBERMAN, *Senior Circuit Judge*:  IronTiger Logistics, a company which ships trucks from manufacturers to retailers around the country, petitions for review of an NLRB determination that IronTiger violated 8(a)(5) and 8(a)(1) of the NLRA when it failed to timely respond to a union request for information the Board deemed presumptively relevant, even though ultimately found irrelevant.

We reject Petitioner's broad challenge to the Board's policy requiring an employer to timely respond to a union's request for information that is presumptively relevant, but nevertheless remand to the Board for further explanation of why the specific requests in this case were "presumptively relevant."

I.

The relationship between the company and its union, the International Association of Machinists, in the period leading up to the General Counsel's complaint against the company in this case, was rather contentious.  The company is a shipping firm that transports trucks from Volvo/Mack and Navistar manufacturing plants to retail outlets. It operates out of four different locations, and employs roughly 100 drivers who are represented by the union.  But IronTiger does not contract with the manufacturers. Rather, it provides its shipping as a service to another company, TruckMovers, which actually contracts

with Volvo and Navistar. TruckMovers is a larger unorganized company owned by the same person, Tom Duvall, who owns IronTiger. He is also the CEO of both companies.

TruckMovers' contracts with Volvo and Navistar permit TruckMovers to itself transport loads or to subcontract to sixteen other trucking companies, but no one company, including TruckMovers itself, can be responsible for transporting more than 75 percent of deliveries for Navistar or 80 percent for Volvo (those provisions obviously prevent a total shutdown of deliveries). When TruckMovers distributes work to IronTiger, the order, or "load," appears on a computer screen, or "kiosk," at the four IronTiger dispatch hubs.

The alleged unfair labor practice took place in 2010, during which time the company and the union were parties to a collective bargaining agreement which ran from 2008 to 2011. The agreement contained a typical subcontracting clause that prevented IronTiger from subcontracting work that its employees could fulfill. It is undisputed that that clause was designed to prevent IronTiger from sending to another carrier (including sending back to TruckMovers) any load once it appeared on IronTiger's dispatch kiosk. But to avoid confusion respecting TruckMovers's role, the parties signed a letter agreement providing "that loads not appearing on the IronTiger...drivers' kiosk are not IronTiger loads and will be moved by carriers other than IronTiger Logistics and the movement of such loads does not constitute Sub-Contracting." It was understood this meant that the union could not lay claim to loads which TruckMovers sent to other shipping companies or which were transported by TruckMovers itself.

In other words, the contractual triggering event, allowing the union to claim bargaining unit work, was the placement of a load on IronTiger's kiosk. As it happened, in 2009 the union

filed a grievance, asserting that twice a load on a dispatch kiosk had been sent back to TruckMovers. The company promptly conceded that it had made a mistake and remedied the violation.

But a year later, on March 16, 2010, the union took a more aggressive position, asserting that too few loads were coming to IronTiger. The Machinists claimed that the company was somehow not complying with the dispatch language in the agreement. Duvall, the company's President, insisted that "[a]ll available IronTiger loads ARE placed on the Board for dispatch," and later " [w]e don't set the priorities. Our customer does." Without disputing factually what Duvall claimed, Anderson, the union president, responded "enough of this bullshit," and "abide by the contract." (In the meantime, involving an unrelated dispute, Anderson demanded that the company reinstate several employees; otherwise, he would "make [Duvall's] life hell.")

Then, following up on its contract claim, the union filed a formal grievance, but nevertheless declined to meet with the company or proceed with the contract's dispute resolution procedure that led to arbitration. Instead, the union sent a request for information on April 12, seeking the identification of all loads dispatched to both the company *and TruckMovers drivers* over the previous six months, the individuals responsible for dispatching drivers for *both* companies, and documentation explaining why loads were dispatched to *TruckMovers* drivers and IronTiger drivers. Despite the request for information relating to TruckMovers, as well as IronTiger, the company named Dan Houk, a TruckMovers employee, as the one responsible for dispatching TruckMovers drivers, as well as the IronTiger employees who dispatched IronTiger drivers. The company explained there was no documentation relating to the dispatching; it was done by "system assignment" (presumably electronically). The company also produced a list of over

10,000 loads that had been placed on IronTiger's kiosk and dispatched to IronTiger drivers over the last six months.[1]

That led to the union's further request on May 11 – the crucial one for our case. The union, referring to the company's response to the union's April letter, asked seven questions explicitly directed to TruckMovers personnel, including drivers and dispatchers, as well as TruckMovers procedures.

Then, turning to the extensive list of over 10,000 loads carried by IronTiger drivers, the union asked for:
(1) the name of each IronTiger driver dispatched for each load;
(2) the destination and mileage for each load; and
(3) all e-mails, faxes "and other documentation from your customers to support the loads dispatched to IronTiger drivers."

The company's attorney, Tom Jones, meeting with Anderson on an unrelated matter, referred to the May 11 request as asking for "a lot of bullshit," to which Anderson replied, "Yes I am, but I need it."

In the meantime, reflecting the tense relationship that had developed between the parties, on May 13, Anderson asserted that the collective bargaining agreement did not even cover two of the four IronTiger dispatch terminals (where the kiosks were situated). The union threatened to strike at those locations. The company, responding, claiming the union was seeking an illegal modification of the contract, filed a refusal to bargain, 8(b)(3), charge against the union. Then the union, on July 15, filed a refusal to bargain, 8(a)(5), charge against the company for neglecting to respond to its May 11 request.

---

[1]The company also noted that the union had indicated it planned to organize TruckMovers.

The company did respond to the union's May 11 request by writing on September 27, stating – which was obvious – that the first seven items in the union's letter referred to TruckMovers personnel and procedure, not anything to do with IronTiger. As for the items relating to IronTiger's operation, the company asked what could be the relevance of the driver's name and destination of the completed 10,000 plus loads. "This request is harassment, burdensome and irrelevant," the company wrote. With regard to communications from customers (presumably TruckMovers), the company's letter stated there were no written communications from customers; requests were forwarded electronically.

On September 30, the regional director [2] issued a complaint against the union for a violation of 8(b)(3). Then, on December 22, the regional director (Solomon-like) issued a consolidated complaint, including a charge against the company for violation of 8(a)(5).

Before the hearing in front of an ALJ, the union settled and posted a notice acknowledging its violation of 8(b)(3). The union also conceded that the company's response of September 27, if it had been a prompt response to the union's request of May 11, would have been adequate to establish that the union's request was for irrelevant information, but it maintained that at least the last three items were presumptively relevant, and the company's delay in responding violated its obligation to bargain – 8(a)(5).

The ALJ, whose recommended decision was essentially adopted by the Board (with one dissent), had little difficulty agreeing with the company that the first seven items in the May 11 request from the union were not only irrelevant, they were

---

[2] Acting, of course, for the General Counsel.

presumptively irrelevant because they related only to TruckMovers, not IronTiger. He also thought the last three items were irrelevant; they had nothing to do with "the grievance relating to failure to place all loads on the IronTiger kiosk." Moreover, he concluded that information relating to assigned IronTiger driver destinations and distances was not relevant. (He did not address the request for communications from customers.) He pointed out that Anderson's concession to Jones (the company's lawyer) that the information sought was "bullshit" and "absent an explanation regarding why the information was needed, confirms my finding that the information requested was irrelevant."

Nevertheless, because the last three items sought were regarded as related to "unit employees," they were presumptively relevant according to the ALJ, and the company's delay in responding was a refusal to bargain. As noted, the Board adopted the ALJ's recommended decision.

## II.

We have little difficulty rejecting Petitioner's broad-scale challenge to the Board's legal policy. The company objects to the Board's "rule" that a company must respond in a timely fashion to a union's request for presumptively relevant information, even if it should turn out that the information is irrelevant. In other words, according to the Board, the burden switches to a company to respond to a union's request for presumptively relevant information. We have previously approved the Board's policy holding that some information is so central to the core of the employer-employee relationship that it is deemed presumptively relevant. *See Oil, Chem. & Atomic Workers Local Union No. 6-418 v. NLRB*, 711 F.2d 348, 359 (D.C. Cir. 1983). And, although we have previously held only that an employer must timely respond to a union's request for

relevant information, *see N.Y. & Presbyterian Hosp. v. NLRB*, 649 F.3d 723, 730 (D.C. Cir. 2011), we have no basis to quarrel with the majority of the Board's extension in this case, to the proposition that an employer must timely respond to a request for presumptively relevant information. This is the sort of legal and policy determination to which we are obliged to defer. *See Crowley Marine Servs., Inc. v. NLRB*, 234 F.3d 1295, 1297 (D.C. Cir. 2000). (We understand that the Board's burden-shifting rule does not saddle the employer with a heavy burden.)

There remains the question whether the union's request for information – specifically the last three items in the May 11 letter – was presumptively relevant. There appears to us to be an obvious defect in the ALJ and Board's reasoning, even if one accepts the breadth of its legal proposition that any information relating to the bargaining unit employees is presumptively relevant. The ALJ never discusses the last request for communications between IronTiger and their customer(s) (presumably TruckMovers). We cannot imagine why such information could be considered presumptively relevant since it does not at all relate, by any stretch, to bargaining unit employees. Neither the ALJ nor the Board answers that question.[3]

Putting aside that Board omission, it is conceded that the first seven items – focusing as they did on TruckMovers – were obviously irrelevant. The shift in the letter to IronTiger operations appears rather peculiar because it is apparently inconsistent with the thrust of the letter. To be sure, the Board has held that a request for presumptively relevant information

---

[3] *Cf. Disneyland Park*, 350 N.L.R.B. 1256, 1258 (2007), holding that a union is not presumptively entitled to subcontracting agreements "even those relating to bargaining unit employees' terms and conditions of employment."

can be included with presumptively irrelevant information, and the burden of responding to the request for the presumptively relevant information would still be placed on an employer. *See Oil, Chem. & Atomic Workers*, 711 F.2d at 361. Still, the request must have seemed fishy to the Petitioner because not only did those items have no connection with the TruckMovers information, it did not seem to have any connection to any issue between the company and the union. Recall when the company's lawyer described the letter as "bullshit," Anderson, the union representative, agreed, and although he insisted he wanted it, he did not suggest *why* he wanted the information.

Indeed, the ALJ relied on that conversation to bolster his conclusion that the last three items were, in fact, irrelevant; i.e., that the union had not indicated any need for it. In other words, the ALJ, faced with exactly the same information the company had on May 13, concluded that the union's request was irrelevant. The Board should explain why, then, that request should be regarded as presumptively relevant.

In the company's September 27 letter – which all parties agree was an adequate response – the "bullshit" comment was elaborated. The company claimed, then and before the ALJ and Board, that the union was seeking to harass the company by asking for obviously burdensome and irrelevant material. It appears to us that the company's complaint may have been justified, yet neither the ALJ nor the Board ever squarely responded to Petitioner's contention.[4] We think the Board must consider both the Petitioner's defense and the implication of a

---

[4]The ALJ noted that the company responded to the April 12 request without claiming harassment, but that is a non sequitur. It was the union's follow-up inquiry on May 11, particularly directed to the massive list in paragraph 5 of units dispatched, that could be thought transparently irrelevant and harassing.

rule that would permit a union to harass an employer by repeated and burdensome requests for irrelevant information only because it can be said it somehow relates to bargaining unit employees – without even a union's statement of its need.

\* \* \*

We remand to the Board for further proceedings.

*So ordered.*